DAVID T. MALOOF (DM 3350)
THOMAS M. EAGAN (TE 1713)
MALOOF BROWNE & EAGAN LLC
411 Theodore Fremd Avenue, Suite 190
Rye, New York 10580-1411
(914) 921-1200
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| NIPPONKOA INSURANCE CO., LTD., U.S. BRANCH, | **08 Civ. 1302 (PAC)** |
| *Plaintiffs,* | |
| - against - | |
| NORFOLK SOUTHERN RAILWAY COMPANY, | **DECLARATION OF THOMAS M. EAGAN IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER** |
| *Defendant.* | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, Thomas M. Eagan, declare that I am a partner of Maloof Browne & Eagan LLC, attorneys for Plaintiff NipponKoa Insurance Company Limited, US Branch ("NipponKoa").

1.      I attach as Exhibit 1 a true copy of the Tables of Contents to the Four Volumes of the 2006 Transportation Telephone Tickler published by the Journal of Commerce.

2.      I attach as Exhibit 2 a true copy of the names of the members of the American Institute of Marine Underwriters from www.aimu.org (with their addresses handwritten in).

3.      I attach as Exhibit 3 a true copy of a summary of docket sheets from

cases filed against Norfolk Southern in the Southern District of New York (taken from Pacer).

4.    I attach as Exhibit 4 a true copy of the map of Norfolk Southern's current routes, taken from the NS website http://222.nscorp.com/nscportal/nscorp/map.html.

5.    I attach as Exhibit 5 a true copy of "The Sompo Decision: A Look Back into the Future of Intermodal Claims," which will be delivered at the United States Maritime Law Association's Annual Convention in Sanibel, Florida on October 24, 2007.

6.    I attach as Exhibit 6 a true copy of relevant excerpts from the hearing transcript from *Sompo Japan v. Norfolk Southern*, 07 Civ. 2735 (November 21, 2007, Tr 20).

7.    I attach as Exhibit 7 a true copy of the MOL Bill of Lading.

8.    I attach as Exhibit 8 a true copy of section 8 of Norfolk Southern's Rail Circular.

9.    I attach as Exhibit 9 a true copy of page 31 of <u>Transportation Logistics and the Law</u>, Augello.

10.    I attach as Exhibit 10 a true copy of the Declaration of Sharon Morrison, Ocean Marine Executive, NipponKoa Management Corporation, dated May 27, 2008.

11.    I attach as Exhibit 11 a true copy of excerpts from the website of Vericlaim.

I declare the foregoing is true and correct under the penalty of perjury of the laws of the United States.

Dated:  Rye, New York
            June 2, 2008

_____
Thomas M. Eagan

The Journal of Commerce

EXHIBIT 1

# 2006

## TRANSPORTATION TELEPHONE
# TICKLER

### www.tickleronline.com

**National Edition Volume I ▪ New York Metropolitan Area**

**Y**

**YANG MING LINE**

Global 24/7 E-Commerce

*Now Simplified...*
**and just a click away!**

YANG MING LINE

## GLOBAL SCHEDULING, BOOKING & TRACKING

- advanced cargo tracking
- interactive scheduling
- e-mailed schedule updates
- book electronically
- print B/L's (draft/release)
- e-mailed cargo tracking
- track vessel position 24/7
- ...and so much more



Logistics

ISO 9001:2000 Certified

www.yml.com.tw

# Volume I

## Table of Contents

How to Use the Tickler .......................... I-4
Advertisers' Index ............................ I-7
Company Listings ..................... I-71 – I-265
Airports .................................. I-266
Associations ............................. I-277
Banks ................................... I-278
Banks, Foreign .......................... I-279
Consulates .............................. I-281
Ports ................................... I-294
U.S. Government .......................... I-313
U.S. Foreign Trade Zones .................. I-315
Metropolitan City Index
   (Header Cities) .......................... I-331
Suburban City Index ....................... I-366
Key to Line of Business Abbreviations ........ I-431

Copyright© 2006 by Commonwealth Business Media, Inc. Printed in USA. All rights reserved. No part of this publication may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by any information storage or retrieval system without written permission from the Publisher. The Publisher has taken all reasonable steps to verify the accuracy of the content of this publication. While the Publisher believes the information was accurate at the time of publication, changes may have occurred since then. Commonwealth Business Media, Inc. shall not be responsible for any errors or omissions that occur in this book or for the quality or practices of the companies represented.

Subscribers of this type of publication have, on occasion, used those publications to compile mailing and telemarketing lists, then to sell or otherwise provide those materials to third parties. Commonwealth Business Media, Inc. considers such use to be wrongful and in violation of the federal copyright laws. Commonwealth Business Media, Inc. does not permit or acquiesce in such use of the publication.

Library of Congress Control Number: 53-34476

ISSN 1078-4241

ISBN-10: 1-891131-96-6 (Vol. I) • 1-891131-97-4 (4-Vol. Set)

ISBN-13: 978-1-891131-96-7 • 978-1-891131-97-4

The Journal of Commerce

TRANSPORTATION TELEPHONE

TICKLER

www.tickleronline.com

**Advertising Sales Director**
John Capers III
jcapers@cbizmedia.com
609 371-7714

**Advertising Sales**
Liz Doyle
ldoyle@cbizmedia.com
609 371-7867

**Editorial Director**
Erich Kaiser
ekaiser@cbizmedia.com

**Editor**
Edith Chaudoin Stahlberger
estahlberger@cbizmedia.com
609 371-7875

**Assistant Editor**
Meghan Belanger
mbelanger@cbizmedia.com

**Production Manager**
Carolyn Tizzano
ctizzano@cbizmedia.com

**Ad Traffic Coordinator**
Helena Sherman
hsherman@cbizmedia.com
609 371-7831

**Subscription Sales • Customer Service**
customerservice@cbizmedia.com
888 215-6084; Fax 609 371-7883

Published by
Commonwealth
BUSINESS ◆ MEDIA

400 Windsor Corporate Park
50 Millstone Rd., Ste. 200
East Windsor, NJ 08520-1415

**Chairman, President and CEO**
Alan Glass

**Sr. V.P., CFO**
Dana Price

**Sr. V.P., Strategy & Operations**
Betsy Sherer

**V.P., Directories Group**
Amy Middlebrook

**V.P., Production & Manufacturing**
Meg Palladino

**Director of Circulation**
John Wengler

# The Journal of Commerce

# 2006

## TRANSPORTATION TELEPHONE

# TICKLER

### www.tickleronline.com

## National Edition Volume II ▪ Aberdeen, WA to Houma, LA



# Skilled  Reliable  Flexible



**FMT**
Stevedoring



**FEDNAV**
Worldwide
Shipping Services



**FEDNAV**
*DIRECT*
Logistics

www.fednav.com
www.fmtcargo.com

# Volume II
## Table of Contents

How to Use the Tickler ........................................ I-4
Advertisers' Index (See Volume I) ......................... I-7
Metropolitan City Index (Header Cities)
  (See Volume I) ............................................... I-331
Suburban City Index (See Volume I) .................... I-366
Company Listings ................................... II-3 – II-681
Aberdeen, WA ................................................. II-3
Abilene, TX ..................................................... II-3
Akron, OH ....................................................... II-5
Albany, NY ...................................................... II-7
Albuquerque, NM ............................................. II-10
Alexandria, VA ................................................ II-14
Allentown, PA .................................................. II-18
Alpena, MI ...................................................... II-21
Altoona, PA ..................................................... II-26
Amarillo, TX .................................................... II-27
Anacortes, WA ................................................ II-29
Anchorage, AK ................................................ II-30
Arlington, VA ................................................... II-32
Asheville, NC .................................................. II-45
Ashland, KY .................................................... II-51
Ashtabula, OH ................................................. II-52
Astoria, OR .................................................... II-53
Atlanta, GA ..................................................... II-53
Austin, TX ...................................................... II-55
Baltimore, MD ................................................. II-93
Bangor, ME ..................................................... II-98
Bathurst, NB, CN ............................................. II-137
Baton Rouge, LA .............................................. II-140
Bay City, MI .................................................... II-141
Beaumont, TX .................................................. II-148
Bellingham, WA ............................................... II-149
Billings, MT .................................................... II-155
Binghamton, NY ............................................... II-160
Birmingham, AL ............................................... II-161
Bismarck, ND .................................................. II-162
Boise, ID ........................................................ II-166
Boston, MA ..................................................... II-170
Bowling Green, KY ........................................... II-172
Bridgeport, CT ................................................. II-209
Bristol, TN ...................................................... II-210
Brownsville, TX ............................................... II-212
Brunswick, GA ................................................. II-213
Buffalo, NY ..................................................... II-220
Burlington, VT .................................................. II-224
Calais, ME ...................................................... II-233
Calgary, AB, CN ............................................... II-236
Camden, NJ .................................................... II-239
Cape Girardeau, MO ......................................... II-245
Caribbean ...................................................... II-253
Casper, WY ..................................................... II-254
Cedar Rapids, IA .............................................. II-263
Champlain, NY ................................................. II-264
                                                            II-266

The Journal of Commerce

**TRANSPORTATION TELEPHONE**

# TICKLER

www.tickleronline.com

**Advertising Sales Director**
John Capers III
jcapers@cbizmedia.com
609 371-7714

**Advertising Sales**
Liz Doyle
ldoyle@cbizmedia.com
609 371-7887

**Editorial Director**
Erich Kaiser
ekaiser@cbizmedia.com

**Editor**
Edith Chaudoin Stahlberger
estahlberger@cbizmedia.com
609 371-7875

**Assistant Editor**
Mehgan Belanger
mbelanger@cbizmedia.com

**Production Manager**
Carolyn Tizzano
ctizzano@cbizmedia.com

**Ad Traffic Coordinator**
Helena Sherman
hsherman@cbizmedia.com
609 371-7831

**Subscription Sales • Customer Service**
customerservice@cbizmedia.com
888 215-6084; Fax 609 371-7883

Published by
## Commonwealth
BUSINESS • MEDIA

400 Windsor Corporate Park
50 Millstone Rd., Ste. 200
East Windsor, NJ 08520-1415

**Chairman, President and CEO**
Alan Glass

**Sr. V.P., CFO**
Dana Price

**Sr. V.P., Strategy & Operations**
Betsy Sherer

**V.P., Directories Group**
Amy Middlebrook

**V.P., Production & Manufacturing**
Meg Palladino

**Director of Circulation**
John Wengler

Vol II cont'd

| | | | |
|---|---|---|---|
| Charleston, SC | II-269 | Eureka, CA | II-556 |
| Charleston, WV | II-293 | Evansville, IN | II-558 |
| Charlotte, NC | II-295 | Everett, WA | II-560 |
| Charlottesville, VA | II-311 | Fairbanks, AK | II-562 |
| Charlottetown, PE, CN | II-312 | Fall River, MA | II-564 |
| Chattanooga, TN | II-312 | Fargo, ND | II-565 |
| Chesapeake, VA | II-315 | Fayetteville, NC | II-569 |
| Cheyenne, WY | II-319 | Flint, MI | II-569 |
| Chicago, IL | II-320 | Florence, AL | II-571 |
| Chicoutimi, QC, CN | II-388 | Fort Myers, FL | II-571 |
| Cincinnati, OH | II-389 | Fort Pierce, FL | II-573 |
| Clarksville, TN | II-402 | Fort Smith, AR | II-574 |
| Clearwater, FL | II-402 | Fort Wayne, IN | II-576 |
| Cleveland, OH | II-403 | Fort Worth, TX | II-580 |
| Colorado Springs, CO | II-418 | Freeport, TX | II-583 |
| Columbia, MO | II-420 | Fresno, CA | II-587 |
| Columbia, SC | II-420 | Gainesville, FL | II-590 |
| Columbus, GA | II-424 | Galveston, TX | II-590 |
| Columbus, OH | II-428 | Gary, IN | II-596 |
| Coos Bay, OR | II-439 | Georgetown, SC | II-599 |
| Cornwall, ON, CN | II-446 | Gloucester, MA | II-601 |
| Corpus Christi, TX | II-449 | Grand Rapids, MI | II-602 |
| Dallas, TX | II-460 | Granite City, IL | II-608 |
| Davenport, IA | II-484 | Great Falls, MT | II-610 |
| Dayton, OH | II-486 | Green Bay, WI | II-613 |
| Decatur, IL | II-491 | Greensboro, NC | II-616 |
| Denver, CO | II-493 | Greenville, MS | II-621 |
| Des Moines, IA | II-504 | Greenville, SC | II-622 |
| Detroit, MI | II-507 | Greenwich, CT | II-627 |
| Dominican Republic | II-529 | Gulfport, MS | II-629 |
| Dothan, AL | II-531 | Hagerstown, MD | II-632 |
| Dover, DE | II-533 | Halifax, NS, CN | II-633 |
| Duluth, MN | II-534 | Hamilton, ON, CN | II-642 |
| Eagle Pass, TX | II-538 | Harrisburg, PA | II-646 |
| Eastport, ID | II-539 | Hartford, CT | II-655 |
| Eau Claire, WI | II-541 | Hawaii | II-662 |
| Edmonton, AB, CN | II-541 | Highgate Springs, VT | II-676 |
| El Paso, TX | II-547 | Houlton, ME | II-679 |
| Erie, PA | II-551 | Houma, LA | II-681 |
| Eugene, OR | II-553 | **Key to Abbreviations** | **II-684** |

Copyright© 2006 by Commonwealth Business Media, Inc. Printed in USA. All rights reserved. No part of this publication may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by any information storage or retrieval system without written permission from the Publisher. The Publisher has taken all reasonable steps to verify the accuracy of the content of this publication. While the Publisher believes the information was accurate at the time of publication, changes may have occurred since then. Commonwealth Business Media, Inc. shall not be responsible for any errors or omissions that occur in this book or for the quality or practices of the companies represented.

Subscribers of this type of publication have, on occasion, used those publications to compile mailing and telemarketing lists, then to sell or otherwise provide those materials to third parties. Commonwealth Business Media, Inc. considers such use to be wrongful and in violation of the federal copyright laws. Commonwealth Business Media, Inc. does not permit or acquiesce in such use of the publication.

Library of Congress Control Number: 53-34476

ISSN 1078-4241

ISBN-10: 1-891131-97-4

ISBN-13: 978-1-891131-97-4

To order the Tickler call (888) 215-6084

**The Journal of Commerce**

# 2006

## TRANSPORTATION TELEPHONE

# TICKLER

### www.tickleronline.com

**National Edition Volume III ▪ Houston, TX to North Bay, ON, CN**

PHA

# THE PORT
# DELIVERS
*the goods*

1-800-688-3625 • www.portofhouston.com

# Volume III

## Table of Contents

How to Use the Tickler ..................... I-4
Advertisers' Index (See Volume I) ............ I-7
Metropolitan City Index (Header Cities)
(See Volume I) ......................... I-331
Suburban City Index (See Volume I) ......... I-366
Company Listings ................. III-3 – III-597
Houston, TX ......................... III-3
Huntsville, AL ........................... III-106
Idaho Falls, ID .......................... III-110
Indianapolis, IN ......................... III-111
International Falls, MN ................... III-121
Jackson, MS ............................ III-122
Jacksonville, FL ......................... III-125
Joliet, IL .............................. III-149
Juneau, AK ............................ III-152
Kalamazoo, MI ......................... III-154
Kamloops, BC, CN ...................... III-155
Kansas City, KS ........................ III-156
Kansas City, MO ....................... III-158
Kenosha, WI ........................... III-165
Key West, FL ........................... III-166
Kingston, ON, CN ....................... III-167
Knoxville, TN .......................... III-169
La Crosse, WI .......................... III-172
Lake Charles, LA ....................... III-172
Lansing, MI ............................ III-177
Laredo, TX ............................ III-179
Las Vegas, NV ......................... III-187
Lexington, KY .......................... III-191
Lincoln, NE ............................ III-193
Little Rock, AR ......................... III-194
London, ON, CN ........................ III-199
Long Beach, CA ........................ III-200
Longview, WA .......................... III-244
Los Angeles, CA ........................ III-246
Louisville, KY .......................... III-323
Lubbock, TX ........................... III-331
Macon, GA ............................ III-333
Madison, WI ........................... III-334
Manchester, NH ........................ III-335
Marietta, OH ........................... III-337
McAllen, TX ............................ III-338
Memphis, TN ........................... III-342
Meridian, MS ........................... III-354
Mexico City, Mexico .................... III-355
Miami, FL ............................. III-364
Milwaukee, WI ......................... III-431
Minneapolis-St. Paul, MN ............... III-441

**The Journal of Commerce**

**TRANSPORTATION TELEPHONE**

# TICKLER

www.tickleronline.com

**Advertising Sales Director**
John Capers III
jcapers@cbizmedia.com
609 371-7714

**Advertising Sales**
Liz Doyle
ldoyle@cbizmedia.com
609 371-7667

**Editorial Director**
Erich Kaiser
ekaiser@cbizmedia.com

**Editor**
Edith Chaudoin Stahlberger
estahlberger@cbizmedia.com
609 371-7875

**Assistant Editor**
Meghan Belanger
mbelanger@cbizmedia.com

**Production Manager**
Carolyn Tizzano
ctizzano@cbizmedia.com

**Ad Traffic Coordinator**
Helena Sherman
hsherman@cbizmedia.com
609 371-7831

**Subscription Sales • Customer Service**
customerservice@cbizmedia.com
888 215-6084; Fax 609 371-7883

Published by
**Commonwealth**
BUSINESS ◆ MEDIA

400 Windsor Corporate Park
50 Millstone Rd., Ste. 200
East Windsor, NJ 08520-1415

**Chairman, President and CEO**
Alan Glass

**Sr. V.P., CFO**
Dana Price

**Sr. V.P., Strategy & Operations**
Betsy Sherer

**V.P., Directories Group**
Amy Middlebrook

**V.P., Production & Manufacturing**
Meg Palladino

**Director of Circulation**
John Wengler

# Vol. Cont'd.

| | | | |
|---|---|---|---|
| Charleston, SC | II-269 | Eureka, CA | II-556 |
| Charleston, WV | II-293 | Evansville, IN | II-558 |
| Charlotte, NC | II-295 | Everett, WA | II-560 |
| Charlottesville, VA | II-311 | Fairbanks, AK | II-562 |
| Charlottetown, PE, CN | II-312 | Fall River, MA | II-564 |
| Chattanooga, TN | II-312 | Fargo, ND | II-565 |
| Chesapeake, VA | II-315 | Fayetteville, NC | II-569 |
| Cheyenne, WY | II-319 | Flint, MI | II-569 |
| Chicago, IL | II-320 | Florence, AL | II-571 |
| Chicoutimi, QC, CN | II-388 | Fort Myers, FL | II-571 |
| Cincinnati, OH | II-389 | Fort Pierce, FL | II-573 |
| Clarksville, TN | II-402 | Fort Smith, AR | II-574 |
| Clearwater, FL | II-402 | Fort Wayne, IN | II-576 |
| Cleveland, OH | II-403 | Fort Worth, TX | II-580 |
| Colorado Springs, CO | II-418 | Freeport, TX | II-583 |
| Columbia, MO | II-420 | Fresno, CA | II-587 |
| Columbia, SC | II-420 | Gainesville, FL | II-590 |
| Columbus, GA | II-424 | Galveston, TX | II-590 |
| Columbus, OH | II-428 | Gary, IN | II-596 |
| Coos Bay, OR | II-439 | Georgetown, SC | II-599 |
| Cornwall, ON, CN | II-446 | Gloucester, MA | II-601 |
| Corpus Christi, TX | II-449 | Grand Rapids, MI | II-602 |
| Dallas, TX | II-460 | Granite City, IL | II-608 |
| Davenport, IA | II-484 | Great Falls, MT | II-610 |
| Dayton, OH | II-486 | Green Bay, WI | II-613 |
| Decatur, IL | II-491 | Greensboro, NC | II-616 |
| Denver, CO | II-493 | Greenville, MS | II-621 |
| Des Moines, IA | II-504 | Greenville, SC | II-622 |
| Detroit, MI | II-507 | Greenwich, CT | II-627 |
| Dominican Republic | II-529 | Gulfport, MS | II-629 |
| Dothan, AL | II-531 | Hagerstown, MD | II-632 |
| Dover, DE | II-533 | Halifax, NS, CN | II-633 |
| Duluth, MN | II-534 | Hamilton, ON, CN | II-642 |
| Eagle Pass, TX | II-538 | Harrisburg, PA | II-646 |
| Eastport, ID | II-539 | Hartford, CT | II-655 |
| Eau Claire, WI | II-541 | Hawaii | II-662 |
| Edmonton, AB, CN | II-541 | Highgate Springs, VT | II-676 |
| El Paso, TX | II-547 | Houlton, ME | II-679 |
| Erie, PA | II-551 | Houma, LA | II-681 |
| Eugene, OR | II-553 | **Key to Abbreviations** | **II-684** |

Copyright© 2006 by Commonwealth Business Media, Inc. Printed in USA. All rights reserved. No part of this publication may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by any information storage or retrieval system without written permission from the Publisher. The Publisher has taken all reasonable steps to verify the accuracy of the content of this publication. While the Publisher believes the information is accurate at the time of publication, changes may have occurred since then. Commonwealth Business Media, Inc. shall not be responsible for any errors or omissions that occur in this book or for the quality or practices of the companies represented.

Subscribers of this type of publication have, on occasion, used those publications to compile mailing and telemarketing lists, then to sell or otherwise provide those materials to third parties. Commonwealth Business Media, Inc. considers such use to be wrongful and in violation of the federal copyright laws. Commonwealth Business Media, Inc. does not permit or acquiesce in such use of the publication.

# The Journal of Commerce

# 2006

## TRANSPORTATION TELEPHONE

# TICKLER

### www.tickleronline.com

### National Edition Volume IV ▪ Oakland, CA to Youngstown, OH

## MTC is Going Global

Marine Terminals Corporation creates strategic partnerships, provides stevedoring services, develops terminal facilities, designs advanced communications systems solutions to facilitate volume growth efficiently, and provides real-time shipping information on demand from anywhere in the world by phone or Internet, 24/7. MTC now provides additional services through MTC International and MTC de Mexico, SA de CV. Contact us to find out more.



MARINE TERMINALS CORPORATION
Ph: 800-676-5252    www.mtcorp.com

# Volume IV

## Table of Contents

How to Use the Tickler ........................... I-4
Advertisers' Index (See Volume I) ................. I-7
Metropolitan City Index (Header Cities)
  (See Volume I) ............................. I-331
Suburban City Index (See Volume I) ............. I-366
Company Listings ..................... IV-3 – IV-602
Oakland, CA ................................. IV-3
Ogdensburg, NY ............................. IV-27
Oklahoma City, OK .......................... IV-30
Olympia, WA ................................ IV-34
Omaha, NE ................................. IV-36
Orlando, FL ................................. IV-40
Ottawa, ON, CN ............................ IV-49
Owensboro, KY .............................. IV-52
Paducah, KY ............................... IV-53
Palm Beach, FL ............................. IV-54
Panama City, FL ............................ IV-58
Pascagoula, MS ............................. IV-60
Pensacola, FL .............................. IV-62
Peoria, IL ................................. IV-65
Petersburg, VA ............................. IV-68
Philadelphia, PA ............................ IV-69
Phoenix, AZ ............................... IV-103
Pierre, SD ................................ IV-111
Pine Bluff, AR ............................. IV-111
Pittsburgh, PA ............................. IV-112
Port Angeles, WA .......................... IV-122
Port Arthur, TX ............................ IV-123
Port Canaveral, FL ......................... IV-126
Port Everglades, FL ........................ IV-129
Port Huron, MI ............................ IV-139
Port Lavaca, TX ........................... IV-142
Port Manatee, FL .......................... IV-144
Portland, ME .............................. IV-146
Portland, OR .............................. IV-151
Portsmouth, NH ........................... IV-182
Portsmouth, VA ........................... IV-184
Prince George, BC, CN ..................... IV-186
Providence, RI ............................ IV-186
Puerto Rico ............................... IV-191
Quebec City, QC, CN ....................... IV-202
Raleigh, NC .............................. IV-205
Rapid City, SD ............................ IV-212
Regina, SK, CN ........................... IV-212
Reno, NV ................................. IV-214
Richmond, CA ............................. IV-218
Richmond, VA ............................. IV-222
Roanoke, VA .............................. IV-231
Rochester, MN ............................ IV-234

**The Journal of Commerce**

**TRANSPORTATION TELEPHONE**

**TICKLER**

www.tickl023online.com

**Advertising Sales Director**
John Capers III
jcapers@cbizmedia.com
609 371-7714

**Advertising Sales**
Liz Doyle
ldoyle@cbizmedia.com
609 371-7867

**Editorial Director**
Erich Kaiser
ekaiser@cbizmedia.com

**Editor**
Edith Chaudoin Stahlberger
estahlberger@cbizmedia.com
609 371-7875

**Assistant Editor**
Mehgan Belanger
mbelanger@cbizmedia.com

**Production Manager**
Carolyn Tizzano
ctizzano@cbizmedia.com

**Ad Traffic Coordinator**
Helena Sherman
hsherman@cbizmedia.com
609 371-7831

**Subscription Sales • Customer Service**
customerservice@cbizmedia.com
888 215-6084; Fax 609 371-7883

Published by
**Commonwealth**
BUSINESS ♦ MEDIA

400 Windsor Corporate Park
50 Millstone Rd., Ste. 200
East Windsor, NJ 08520-1415

**Chairman, President and CEO**
Alan Glass

**Sr. V.P., CFO**
Dana Price

**Sr. V.P., Strategy & Operations**
Betsy Sherer

**V.P., Directories Group**
Amy Middlebrook

**V.P., Production & Manufacturing**
Meg Palladino

**Director of Circulation**
John Wengler

Vol IV cont'd.

| | |
|---|---|
| Rochester, NY .................... IV-235 | Sudbury, ON, CN ................ IV-440 |
| Rockford, IL ..................... IV-240 | Superior, WI .................... IV-441 |
| Sacramento, CA ................. IV-242 | Sydney, NS, CN ................. IV-442 |
| Saint John, NB, CN ............. IV-249 | Syracuse, NY ................... IV-443 |
| Salem, NJ ....................... IV-251 | Tacoma, WA .................... IV-445 |
| Salt Lake City, UT .............. IV-252 | Tallahassee, FL ................ IV-455 |
| San Antonio, TX ................ IV-260 | Tampa, FL ...................... IV-457 |
| San Diego, CA .................. IV-265 | Thunder Bay, ON, CN ........... IV-475 |
| San Francisco, CA .............. IV-281 | Toledo, OH ..................... IV-477 |
| San Jose, CA .................... IV-316 | Topeka, KS ..................... IV-484 |
| Santa Barbara, CA .............. IV-319 | Toronto, ON, CN ................ IV-485 |
| Sarnia, ON, CN ................. IV-324 | Trenton, NJ ..................... IV-505 |
| Saskatoon, SK, CN .............. IV-325 | Trois-Rivieres, QC, CN ........... IV-508 |
| Sault Ste. Marie, MI ............ IV-326 | Tucson, AZ ..................... IV-508 |
| Savannah, GA ................... IV-328 | Tulsa, OK ...................... IV-511 |
| Scranton, PA ................... IV-348 | Vancouver, BC, CN ............. IV-517 |
| Searsport, ME ................... IV-349 | Vancouver, WA ................. IV-543 |
| Seattle, WA ..................... IV-350 | Veracruz, Mexico ............... IV-547 |
| Shreveport, LA .................. IV-400 | Victoria, BC, CN ................ IV-553 |
| Sioux City, IA ................... IV-403 | Virginia Beach, VA .............. IV-554 |
| Sioux Falls, SD ................. IV-404 | Waco, TX ...................... IV-557 |
| South Bend, IN .................. IV-406 | Washington, DC ................ IV-558 |
| Spokane, WA ................... IV-410 | Wheeling, WV ................... IV-575 |
| Springfield, IL .................. IV-414 | Wichita, KS .................... IV-576 |
| Springfield, MA ................. IV-415 | Wilmington, DE ................. IV-580 |
| Springfield, MO ................. IV-416 | Wilmington, NC ................. IV-584 |
| St. Albans, VT .................. IV-418 | Winchester, VA ................. IV-591 |
| St. John's, NL, CN .............. IV-421 | Windsor, ON, CN ............... IV-592 |
| St. Joseph, MO .................. IV-423 | Winnipeg, MB, CN .............. IV-594 |
| St. Louis, MO ................... IV-423 | Worcester, MA ................. IV-599 |
| Stamford, CT ................... IV-434 | Youngstown, OH ............... IV-601 |
| Stockton, CA .................... IV-436 | **Key to Abbreviations** ........... **IV-603** |

Copyright© 2006 by Commonwealth Business Media, Inc. Printed in USA. All rights reserved. No part of this publication may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by any information storage or retrieval system without written permission from the Publisher. The Publisher has taken all reasonable steps to verify the accuracy of the content of this publication. While the Publisher believes the information was accurate at the time of publication, changes may have occurred since then. Commonwealth Business Media, Inc. shall not be responsible for any errors or omissions that occur in this book or for the quality or practices of the companies represented.

Subscribers of this type of publication have, on occasion, used those publications to compile mailing and telemarketing lists, then to sell or otherwise provide those materials to third parties. Commonwealth Business Media, Inc. considers such use to be wrongful and in violation of the federal copyright laws. Commonwealth Business Media, Inc. does not permit or acquiesce in such use of the publication.

**Library of Congress Control Number: 53-34476**
**ISSN 1078-4241**
**ISBN-10: 1-891131-97-4**
**ISBN-13: 978-1-891131-97-4**

**To order the Tickler call (888) 215-6084**

 **American Institute of Marine Underwriters**

● Home
● Contact Us
● Join Us
● IUMI

| About AIMU | Surveyors | Regulations | Papers & Reports | Education | Forms | Statistics | Commodities | Issues Book |

# MEMBERS

## INSURER MEMBERS
ACE USA (NY)
American Hull Insurance Syndicate (NY)
American International Group (NY)
American Marine Insurance Clearing House
American Marine Underwriters
American Offshore Insurance Syndicate (NY)
Arch Insurance Co. (NY)
AXA Corporate Solutions Insurance Co. (NY)
Axiom Insurance Management
Axis Reinsurance Company (NY)
Beazley Insurance Company Inc.
Century Surety Company
Chubb & Son Inc. (NY)
Covenant Underwriters, Ltd.
CNA Marine
Commonwealth Insurance Company of America
Endurance Reinsurance Corp. of America (NY)
Everest Reinsurance Company (NJ)
Fireman's Fund McGee Marine (NY)
FM Global
Foremost Insurance Company
General Cologne Re (NY)
Great American Insurance Companies (NY)
Hanover / Citizens Insurance Group
Hartford Insurance Group
IMU/One Beacon Insurance (NY)
International Specialty, Inc
Liberty International Underwriters (NY)
Markel American Insurance Company
Mitsui Sumitomo (NY)
Munich Reinsurance America, Inc. (NJ)
National Liability & Fire Insurance Company (NY)
Navigators Group (NY)
NIPPONKOA Insurance Co. Ltd., U.S. Branch
Ocean Marine Indemnity Company
Old United Casualty Company
Platinum Underwriters Reinsurance, Inc. (NY)
RLI Insurance Company
Scottsdale Insurance Company
Selective Insurance Company of America (NJ)
Sompo Japan Ins. Co. of America (NY)

## LEGAL COUNSEL
Thacher Proffitt & Wood

## BROKERS
Aon Risk Services
Arthur J. Gallagher & Co.
Expeditors Cargo Insurance Brokers, Inc.
Falvey Cargo Underwriting
G & M Marine Inc.
Frenkel & Co., Inc.
Hilb Rogal & Hobbs
Hugh Wood, Inc.
Integro Insurance Brokers
International Bond & Marine
International Specialty Risks
Maritime General Agency
Marsh Inc.
Point Clear Insurance Services LLC
Royal Marine Insurance Group (RMIG)
The McIntyre Group
Trident Marine Managers, Inc.
Universal Insurance Services, Inc.
Wachovia Insurance Services
WFT Incorporated
Willis

## CLAIMS SETTLING & SERVICES/SURVEYING
BMT Salvage Ltd. (The SA)
Cooper Capital Specialty Salvage, LLC
CRAIG/is Ltd.
Ewig International
International Cargo Loss Prevention, Inc.
Minton, Treharne & Davies (USA) Inc.
MMK International Marine Services Inc.
National Association of Marine Surveyors
National Cargo Bureau, Inc.
National Marine Consultants
Oceanwide Inc.
Salvage Sale, Inc.
Schenker Inc.
Shipowners Claims Bureau Inc.

# EXHIBIT 2

Swiss Re (NY)
Tokio Marine & Nichido Fire Insurance Co., Ltd. (NY)
(US Branch)
Transatlantic Reinsurance Company (NY)
Travelers
Water Quality Insurance Syndicate (NY)
XL Reinsurance America Inc.
XL Specialty Insurance Company
Zurich American Insurance Company (NY)

VeriClaim Inc.
W. K. Webster (Overseas) Ltd.

## LAW FIRMS
Badiak & Will, LLP
Bullivant Houser Bailey PC
Emmett, Cobb, Waits & Henning
Fowler Rodriquez Chalos
Gibson Robb & Lindh LLP
Hayden and Milliken
Hamilton Miller & Birthisel, LLP
Hill Rivkins & Hayden
Houck, Hamilton & Anderson, P.A.
Kennedy Lillis Schmidt & English
Locke Liddell & Sapp
Lyons & Flood, LLP
Maginnis & Hurley
Mahtook & Lafleur, LLC
Maloof & Browne
Mattioni, Mattioni & Mattioni, Ltd.
McDermott & Radzik, LLP
Mendes & Mount
Mound, Cotton, Wollan & Greengrass
Nicoletti, Hornig Campise & Sweeney
Palmer Biezup & Henderson LLP
Stepp & Sullivan, P.C.
Waesche, Sheinbaum & O'Regan

## REINSURANCE INTERMEDIARIES
AON Reinsurance Inc.
Benfield Inc.
BMS Vision Reinsurance Intermediaries, Inc.
Guy Carpenter & Co.
Towers Perrin Reinsurance
Wellington Underwriting Inc.
Willis Re Inc.

## AFFILIATE
Board of Marine Underwriters of San Francisco,
Inc.

Home | Contact Us | Join Us | About AIMU | Global Correspondents | Regulations | Papers | Education | Forms | Stats |
Commodities | Issues Book

2 of 2                                                      9/18/2007 2:54 PM

| MBE # | SDNY CASE | Norfolk Southern Attorney | RESOLUTION | Norfolk Southern Motion to Dismiss/Transfer | OUTCOME |
|---|---|---|---|---|---|
| #1 | 3-90 | 90-cv-02209-MGC | --n/a | --n/a | --n/a |
| #2 | 10-90 | 90-cv-06756-MBM | ✓ | Order of discontinuance | Case Closed |
| #3 | 3-91 | 91-cv-01671-TPG | Mark Landman | ✓ | ✓ | Case Closed |
| #4 | 5-91 | 91-cv-03438-KC | Saul Sorkin | Order | Interdistrict transfer to Western District | Case Closed |
| #5 | 2-92 | 92-cv-01306-JES | Saul Sorkin | Stipulation and Order of Dismissal | | Case Closed |
| #6 | 12-93 | 93-cv-08825-MGC | Hyman Hillenbrand | Motion of Dismissal | | Case Closed |
| #7 | 5-94 | 94-cv-03709-JGK | Barry Gutterman | Motion to Dismiss | | Case Closed |
| #8 | 6-96 | 96-cv-04318-LMM | Michael Siris | Stipulation of Settlement and Discontinuance | | Case Closed |
| #9 | 7-98 | 98-cv-04954-LMM | -- ✓ | Order of Dismissal | | Case Closed |
| | | | | Stipulation and | | Case Closed |

EXHIBIT 3

| # | Date | Case Number | Name | Order | Document | Status |
|---|------|-------------|------|-------|----------|--------|
| #10 | 7-98 | 98-cv-05183-RO | Barry Gutterman | ✓ | Conditional Order and Stipulation of Discontinuance | Case Closed |
| #11 | 9-98 | 98-cv-06380-MBM | Barry Gutterman | ✓ | Order | Case Closed |
| #12 | 1-99 | 99-cv-00055-WHP-HBP | Barry Gutterman | ✓ | Stipulation and Order | Case Closed |
| #13 | 1-99 | 99-cv-00634-LMM | Henry Wasserstein | ✓ | Stipulation and Order | Case Closed |
| #14 | 11-99 | 99-cv-11053-DLC | Barry Gutterman | ✓ | Conditional Order of Discontinuance | Case Closed |
| #15 | 11-99 | 99-cv-11553-SHS | -- | | Consent Order Discontinuing the Action | Case Closed |
| #16 | 03-00 | 00-cv-02295-JCF | | ✓ | Stipulation of | Case Closed |

| # | | | | Discontinuance | | |
|---|---|---|---|---|---|---|
| #17 | 05-00 | 00-cv-03979-CLB | Barry Gutterman | √ | Stipulation of Dismissal & Order; Notice of Mediator | Case Closed |
| #18 | 07-00 | 00-cv-05622-DCL | Lawrence R. Bailey, Jr. | √ | Stipulation of Voluntary Dismissal | Case Closed |
| #19 | 08-00 | 00-cv-05821-MBM | Michael J. Siris | √ | | Case Closed |
| #20 | 08-00 | 00-cv-06319-LTS-MHD | Barry Gutterman | √ | Order | Case Closed * Memo RE parties request an additional 30 days to reopen this matter due to a lack of settlement. Granted |
| #21 | 02-01 | 01-cv-01304-MHD | Gutterman Associates | √ | Order of Discontinuance | Case Closed |
| #22 | 03-01 | 01-cv-02021-KMW | Carol A. Stevens | √ | Judgment Order #03 / Stipulation and | Case Closed |

| | | | | Order | | |
|---|---|---|---|---|---|---|
| | | | Barry Gutterman | | Order | |
| #23 | 04-01 | 01-cv-03477-RMB | Barry Gutterman | ✓ | Order of Discontinuance | Case Closed |
| #24 | 06-01 | 01-cv-04752-CLB-MDF | Barry Gutterman | ✓ | | Case Closed |
| #25 *Our Case | 06-01 | 01-cv-05413-RCC | Everett Gibson | ✓ | Order of Discontinuance | Case Closed |
| #26 | 06-01 | 01-cv-05839-NRB | Michael Siris | ✓ | Order of Discontinuance | Case Closed |
| #27 | 08-01 | 01-cv-07679-JGK | Barry Guttermann | ✓ | Order of Discontinuance | Case Closed |
| #28 | 11-01 | 01-cv-10249-SAS | Barry Gutterman | ✓ | Stipulation and Order | Case Closed |
| #29 | 04-02 | 02-cv-02627-LLS | Barry Gutterman | ✓ | Consent Order of Discontinuance | Case Closed |
| #30 | 05-02 | 02-cv-04178- | Barry Gutterman | ✓ | | Case Closed |

| # | Date | Case No. | LAP-RLE | Conditional Order of Discontinuance | Notes | Status |
|---|---|---|---|---|---|---|
| #31 | 06-02 | 02-cv-04311-DLC | Barry Gutterman | -- | Interdistrict transfer to the District of New Jersey Assigned Case no. 01-cv-4277-SMO (STIP/NO MOTION) | Case Closed |
| #32 | 07-02 | 02-cv-05272-NRB | ✓ | ✓ | | Case Closed * Memo-RE plaintiff's request an additional 30 days to reopen this matter due to a lack of settlement Granted |
| #33 | 07-02 | 02-cv-05558-BSJ-GWG | ✓ Barry Gutterman | -- Stipulation and Order | | Case Closed |
| #34 | 08-02 | 02-cv-06882-RCC | -- Barry Gutterman | ✓ Notice of Voluntary Dismissal Rule 41 (a) (1) | | Case Closed |
| #35 | 09-02 | 02-cv-06966-LTS | -- | -- | | Case Closed |
| #36 | 09-02 | 02-cv-07099- | ✓ | ✓ | | Case Closed |

| # | Date | CLB | Richard O'Keefe | Order | |
|---|------|-----|-----------------|-------|--|
| #37 | 09-02 | 02-cv-07321-BSJ | √ | √ Order of Discontinuance | Case Closed |
| #38 | 09-02 | 02-cv-07743-JES | Ilene Feldman | √ Stipulation and Order | Case Closed |
| #39 | 10-02 | 02-cv-07872-SHS-AJP | Barry Gutterman | √ Order of Dismissal on Consent | Case Closed |
| #40 | 11-02 | 02-cv-09523-DAB-MHD | Jose Rios | -- | Case Closed CASREF |
| #41 | 01-03 | 03-cv-00121-JGK-THK | Barry Gutterman | √ Stipulation and Order | Case Closed |
| #42 | 03-03 | 03-cv-01962-HB | Barry Gutterman | √ Stipulation and Order | Case Closed |
| #43 | 04-03 | 03-cv-02357-JGK | Barry Gutterman | √ Order of Discontinuance | Case Closed |
| #44 | 09-03 | 03-cv-06974-THK | -- | √ Stipulation and Order of | Case Closed |

| # | Date | Case Number | | Discontinuance | | Status |
|---|---|---|---|---|---|---|
| #45 | 12-03 | 03-cv-09791-LAK | √ Barry Gutterman | -- | | Case Closed, ECF |
| #46 | 02-04 | 04-cv-00995-RCC | -- | -- | | Case Closed |
| #47 | 06-04 | 04-cv-04609-CLB | -- | -- | | Case Closed |
| #48 | 11-04 | 04-cv-09056-KNF | √ Barry Gutterman | -- | | Case Closed, ECF, Magconsent |
| #49 | 12-04 | 04-cv-09662-RMB | √ Barry Gutterman | -- | | CASRF, ECF |
| | | 04cv009662RMB.doc "082807" | √ Barry Gutterman | | | |
| #50 | 01-05 | 05-cv-00868-LLS | √ Barry Gutterman | -- | | Case Closed, ECF |
| #51 | 02-05 | 05-cv-0206-LTS-GWG | √ Barry Gutterman | -- | | Case Closed, ECF, CASRF |
| #52 | 03-05 | 05-cv-02932-DC | √ Kenneth King | -- | | ECF |
| | | 05cv02932DC.doc "082807" | | -- | | |

| # | Date | Case No. | | | Notes | Status |
|---|------|----------|---|---|-------|--------|
| #53 | 07-05 | 05-cv-06537-BSJ "082807 05cv06537BSJ.doc" | √ Barry Gutterman | -- | -- | ECF |
| #54 | 05-06 | 06-cv-03507-GBD | -- | | -- | 10/24/06 06cv03507GBD.pdf<br>* Cargo moved from Mississippi to NY<br>Case Transferred Out to USDC-Jersey NO MOTION | Case Closed ECF |
| #55 | 08-06 | 06-cv-06163-HB | : | | : | "082807 06cv06163HB.pdf"<br>* Cargo moved from NC to Idaho<br>District of North Carolina NO MOTION<br>Case Transferred Out to USDC-Western | Case Closed ECF |
| #56 | 09-06 | 06-cv-07748-AKH | √ Keenan Cohen & Howard P.C. | | : | "082807 06cv07748.pdf"<br>*Cargo moved KY-WA-Taiwan<br>Case Transferred Out to USDC-Western District of Kentucky | Case Closed ECF |
| #57 | 01-07 | 07-cv-00176- | √ | | : | "082807 06cv07748.pdf" | Case Closed ECF — Sompo 7/06 |

| | | | | | ECF |
|---|---|---|---|---|---|
| JGK | 07-cv-001763GK.doc<br>"082807 | | | | |
| | Keenan Cohen<br>& Howard P.C. | | | Transferred in from USDC Eastern<br>District Michigan to S.D.N.Y. | -- |
| #58   03-07 | 07-cv-02104-<br>PKC<br>07c002104PKC.doc"<br>"082807 | √ | Charles Howard | -- | --<br>ECF CASREF |
| #59   04-07<br>*OUR CASE | 07-cv-02735-<br>DC<br>07c02735.doc"<br>"082807 | √ | Barry<br>Gutterman | -- | Motion to Transfer | -- |

Home



PDF version

Terms and Conditions | Privacy Policy | Contact Us | © Norfolk Southern Corp.

EXHIBIT **4**    9/19/2007

# The Sompo Decision:
## A Look Back Into The Future of Intermodal Cargo Claims

David T. Maloof, Esq.
Maloof Browne & Eagan LLC



# The Sompo Decision: A Look Back Into the Future of intermodal Cargo Claims

### David T. Maloof, Esq.

When the United States Supreme Court issued its decision in Norfolk *Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004), and proceeded to radically extend maritime law inland to cover intermodal cargo claims, they fail to consider fundamental transportation law. Namely, they did not take note (at least overtly) that Congress had already created a statutory scheme, in the form of the Carmack Amendment, 49 U.S.C.A. § 11706, along with the Staggers Amendment 49 USC § 10502(e), which for nearly a century had already broadly regulated such cargo claims.[1]

And so on Nov. 9th, 2004-- after just one month of consideration following oral argument-- Justice Sandra Day O'Connor wrote, and the Supreme Court ruled unanimously, that the ocean liability regime passed by Congress known as the Carriage of Goods by Sea Act (COGSA) then found at 49 Stat. 1208, 46 U.S.C. App § 1303, could be applied contractually to inland intermodal railroad cargo claims, without shippers ever being offered a Carmack liability option.

The ruling was profound in its effect. Under COGSA the liability of carriers can be limited to $500 per package, a carrier can be exonerated from liability if it exercised due diligence to avoid the cargo damage, and all law suits for cargo damage must be filed within 1 year of the cargo delivery. In contrast, under the Carmack Amendment, full carrier liability is presumed (in the absence of a tightly scripted method of confirming that a shipper has agreed to a lesser released value), carriers are subject to *de facto* strict liability (subject only to a handful of relatively rare exceptions) and while claims can be contractually required to be filed with the carrier within 9 months, a shipper has two years from declination of their claim before it must fie a law suit.

The anomaly of the Supreme Court's ruling did not go unnoticed by those of us who often represent cargo interests for a living. On April 27th, 2005 in the "Outside Counsel" column of the New York Journal (Volume 233, no. 80) myself and my colleague Barbara Sheridan wrote as follows:

---

[1] The Justices were not solely at fault. Apparently the issue of the Carmack Amendment's applicability to the claim at issues was never put squarely before them by the parties. Indeed, to the contrary, at the *certiorari* stage, cargo interest brief took the position that the Supreme Court should accept the case because it did not involve Carmack.

David Maloof is a senior partner in Maloof Browne & Eagan LLC. B.A., Columbia University *magna cum laude, phi beta kappa*; J.D. University of Virginia. He served as counsel for the plaintiff in *Sompo*.

"Carmack Amendment Ignored

Exercising this admiralty jurisdiction, the [Kirby] Court extended principles of the maritime law in order to limit the shipper's recovery for cargo damage from the railroad. Perhaps even more surprising is that the Supreme Court ignored the fact that Congress had already provided for a non-admiralty law liability scheme applicable to railroads, particularly the Carmack Amendment.

Thus, with the stroke of a pen, and with no congressional mandate, admiralty lawyers, a plurality of which practice in New York, have suddenly found their area of law vastly expanded and have been called upon to master an entirely new industry over a century after its creation."

The article went on to note the enormous practical significance of the *Kirby* decision for future shippers, given the lack of voluntary incentives for the railroad industry, to offer fair rates to them:

"In holding that the train wreck in *Kirby* fell within the Court's admiralty jurisdiction, the Court thus overlooked an entire statutory scheme that Congress had already enacted to regulate the railroad industry. As noted above, the Court's ruling has the potential of denying shipper's significant rights that should be available to them pursuant to these statutes. This is particularly troublesome in that just four railroads[2] account for 95% of the industry's traffic in this country. William J. Augello, Transportation Logistics and the Law, *supra*, p. 31. Indeed, these four railroads control over 107,500 miles of railroad track, and, as to be expected, their dominance has been enormously profitable for them; in 2002, they had combined revenue of $35.6 billion. *See* www.oligopolywatch.com/2003/11/01.html, "Industry brief: US railroads". The net result of having such few railroads control the vast majority of the industry's business is that a virtual oligopoly exists in the industry, thus providing shippers with a single alternative to transport goods by rail in that region.[3] In exchange for such privileges, it can be said that Congress has required those railroads offer their shippers options such as Carmack liability."

---

[2] These four railroads are Union Pacific, Burlington Northern Santa Fe, CSX Corporation and Norfolk Southern. William J. Augello, Transportation Logistics and the Law, (TCPC 2001), p. 31, note 50.
[3] Union Pacific and Burlington Northern Santa Fe largely dominate the West, and CSX and Norfolk Southern dominate the East and South. *See* www.oligopolywatch.com/2003/11/01.html.

3

It would be two years, however, on July 10th, 2006 before the Second Circuit Court of Appeals, tiptoeing gingerly around the evident oversight of their senior colleagues, would rule that the Carmack Amendment does indeed apply to intermodal rail cargo claims. *Sompo Japan Ins. Co. v. Union Pacific Railroad Co.,* 456 F.3d 54 (2nd Cir. 2006).

In contrast to Justice O'Connor, the Second Circuit took almost a year to write the *Sompo* opinion, which runs to almost 20 full pages on Westlaw. Noting that in *Kirby* the issue of the Carmack Amendment's applicability was not squarely raised, they did not treat it as binding precedent. Rather, they found more persuasive an exceptionally detailed District Court opinion out of the Fifth Circuit, *Berlanga v. Terrier Transp., Inc.,* 269 F. Supp. 2d 821, 829-30 (N.D. Tex. 2003).

The Sompo Court ultimately reached the following pertinent transportation law conclusions:

1. Rail claims, whether they be domestic in origin or international intermodal movements, are subject to the Carmack Amendment and the Stagger's Rail Act of 1980.

2. Those domestic statues require, in order for a railroad to obtain a limitation of liability, that it must specifically offer the shipper the option of having full Carmack liability.

3. These principles apply equally to both import and export shipments.

*Sompo* has since been carefully followed by District Judges in the Second Circuit: *Sompo v. Union Pacific,* 2007 WL 2230091 (S.D.N.Y. 2007) (J. McMahon); *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.,* 2007 WL 541958 (S.D.N.Y. 2007) (J. Kaplan).

One impediment to the Second Circuit reaching its *Sompo* decision even sooner was the fact that four other Circuit Courts of Appeal previously held that the Carmack Amendment generally did not apply to intermodal shipments *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.,* 799 F.2d 697, 701 (11th Cir. 1986); *Capitol Converting Equipment, Inc. v. LEP Transport, Inc.,* 965 F.2d 391, 394-395, (7th Cir. 1992); *Shao v, Link Cargo (Taiwan) Ltd.* 986 F.2d 700, 701-704, (4th Cir. 1993); *American Road Service Co. v. Consolidated Rail Corp.,* 348 F.3d 565, 568 (6th Cir. 2003).

Reviewing those decisions, the Second Circuit concluded, "Most Courts that have answered this question tend to reiterated the Eleventh Circuit's articulation of its holding in *Swift Textiles v. Watkins MotorLines Inc.* .." In short, the other Circuit Courts had engaged in little primary analysis beyond accepting the *Swift Textiles* ruling, which dated back twenty years. The purported ruling in *Swift Textile* was that the Carmack Amendment only applied to intermodal shipments when a separate domestic bill of lading was issued with respect to those shipments, and that had in fact become the law in four Circuits.

4

The Second Circuit noticed, however -- as had the Judge in *Berlanga*-- a fundamental inconsistency between the facts in the *Swift Textile* case and with the manner in which the Eleventh Circuit had articulated its holding. The holding states that the Carmack Amendment will apply " as long as the domestic leg [of the shipment] is covered by separate bill or bills of lading. But as the Second Circuit noted:

> "The court's statement that a domestic bill of lading is *necessary* for Carmack to apply is perplexing to say the least. Indeed, it was the separate domestic bill of lading (covering a purely intrastate journey) in *Swift* that the motor carrier employed, unsuccessfully, to argue that Carmack *did not* apply. Once the *Swift* court had determined that the parties intended a continuous shipment from the foreign place of origin to the final destination, it deemed the separate domestic bill of lading to be irrelevant. Further, the version of Carmack in force at the time of *Swift* explicitly provided that a motor (or rail) carrier's failure to issue a bill of lading did not remove the carrier from Carmack's reach, *see* 92 Stat. at 1359, 1361, 1453, and that provision still exists as to rail carriers, *see* 49 U.S.C. § 11706(a).

> The disconnect between *Swift's* reasoning and the articulation of its holding has not gone unnoticed. *See, e.g., Berlanga,* 269 F.Supp.2d at 829. In fact, recognizing *63 the inconsistency, one court has hypothesized that *Swift's* use of the phrase "as long as" instead of "even if" was due to a typographical error. *See Canon USA,* 1992 WL 82509, at *7. We are therefore reluctant to rely on any line of precedent derived from *Swift's* articulated holding." (Emphasis in original).

The Second Circuit went on to note the large amount of "confusion" caused by *Swift Textile's* articulated holding. For example, in *Capitol Converting, supra,* 965 F.2d 391, the Seventh Circuit, having committed themselves to trying to find some logic in the decision, held that Carmack would only apply to a shipment of goods that originated in a foreign country if there was "a separate domestic segment" of the shipment. In point of fact, the Second Circuit noted, that could not have been the basis of the *Swift Textile* holding, because the Eleventh Circuit stated clearly that the shipment in question was a single shipment in "continuation in foreign commerce." *Sompo, supra,* 456 F.3d at 63, n.11. Moreover, if *Capital Converting's* view of the basis for *Swift Textiles* holding was correct, then the Eleventh Circuit should have held that the Carmack Amendment did not apply because "unlike the domestic *interstate* shipment in *Capital Converting,* the domestic shipment in *Swift* was an *intrastate* shipment to which Carmack clearly does not apply." *Sompo, supra,* 456 F. 3d 63, n 11. (Emphasis in original).

But the errors did not stop there. As the *Sompo* Court noted, several Courts then went on to adopt the *Capitol Converting* explanation of the *Swift Textile* holding-- entirely erroneous as it may be-- and to find on that basis that the Carmack Amendment did not apply to other intermodal shipments. *See Tokio Marine & Fire Ins. Co. v. Kaisha,* 25 F.Supp.2d 1071, 1081 (C.D.Cal.1997); *N.Y. Marine & Gen. Ins. Co. v. S/S "Ming Prosperity",* 920 F.Supp. 416, 425 (S.D.N.Y.1996); *Toshiba International Corp. v. M/V Sea-Land Exp.,* 841 F. Supp. 123, 128. (S.D.N.Y. 1994).

5

Finally, by way of proving that overlooking relevant transportation law was not the sole province of the United States Supreme Court, the Eleventh Circuit on August 7th, 2006, decided *Altadis USA, Inc. v. Sea Star Line LLC,* 458 F3.d 1288 (7th Cir. 2006). Notwithstanding the fact that the *Sompo* decision had come down almost a month before, the Eleventh Circuit in *Altadis* failed to distinguish the decision[4] (and thus one can only assume overlooked it) and ruled once again that the Carmack Amendment did not apply to intermodal shipments, absent a separate inland bill of lading. *Id.* at 1291-1293. The shipment in *Altadis* happened to involve motor truck cargo, but the principles set forth in *Sompo* with respect to Carmack's jurisdictional scope should have applied with equal force, assuming that the holding itself was valid.

Interestingly enough, the US Supreme Court granted *certiorari* in *Altadis, but* the case settled before oral argument.

*Sompo* has generated much discussion. Some trucking law practitioners have published articles lamenting the decision, but not surprisingly, given the decision's detailed research, almost all of the scholarly debate has been favorable. In a paper prepared as part of the New York Forum of Maritime Law Professors' Spring CLE Program at the Association of the Bar of City of New York in May of 2007, entitled "When Ocean Cargo is Damaged in a Train Wreck," the leading maritime law Professor Michael F. Sturley of the University of Texas School of Law described the *Sompo* decision as "a detailed analysis of the question" wherein the Court "carefully examined" the issue of the scope of Carmack's applicability. Sturley went on to say that "that the Second Circuit and the District Court in *Berlanga* were the only courts that had carefully examined the issue." Similarly, the highly respected Benedict's Maritime Bulletin (Volume IV, 3-4, Third/Forth Quarter 2006) published an article entitled "A Challenge to Kirby" which stated that "the reasoning in *Sompo* as to the applicability of Carmack is compelling." And Judge Lewis Kaplan known as one of the most scholarly judges in the Southern District of New York, has described the decision as "an exceptional instructive opinion." *Rexroth Hydraudyne B.V. v. Ocean World Lines Inc., supra,* 2007 WL 541958 (S.D.N.Y. 2007).

At the Tulane Maritime Law Institutes 2007 Conference the question of whether Sompo will ultimately be upheld by the US Supreme Court was put to three leading admiralty law professors; two of the three agreed that it would be so upheld, with the third stating that he did not know the case well enough to give an opinion. The *Sompo* decision may now be history, but it is also quite likely to be the future.

---

[4] Again, the transportation bar appears to have let down the bench by failing to bring the *Sompo* decision to the *Altidas* court's attention-- although briefing was indeed completed well before *Sompo* came down.

# In The Matter Of:

## *SOMPO JAPAN INSURANCE COMPANY v.*
## *NORFOLK SOUTHERN RAILWAY*

---

*November 21, 2007*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 7b11somc.txt, Pages 1-45

**Word Index included with this Min-U-Script®**

EXHIBIT 6

Page 17

[1] you'd like the complaint.

[2]      THE COURT: Okay. Thank you. It's the same

[3] derailment?

[4]      MR. MALOOF: The same derailment.

[5]      THE COURT: Different parties or...

[6]      MR. MALOOF: It's a different plaintiff, same

[7] defendants. Liability issues are the same. Where it might be

[8] significant is that one of the cargos was surveyed in

[9] Tennessee, not in Georgia.

[10]      And what I've also prepared --

[11]      THE COURT: Why is that? Why would it have been --

[12]      MR. MALOOF: I think that's where the receiver was and

[13] so they waited until it went to the receiver to do the survey.

[14]      THE COURT: Why was the cargo surveyed in Georgia

[15] here?

[16]      MR. MALOOF: Because that's where the receivers were,

[17] so they took it on to destination.

[18]      I also have a chart now of the six claims that would

[19] be pending for the Court. I've given one to Mr. Howard.

[20]      THE COURT: Why don't you address the fact that the

[21] surveyors are in Georgia or, in this other case, in Tennessee.

[22]      MR. MALOOF: Thank you, your Honor. Actually, I think

[23] one of the surveyors is in Texas, and in connection with these

[24] new claims which have been filed, the survey was done in

[25] Tennessee.

Page 18

[1]      But with respect to the surveyors that are in Georgia,

[2] I have already stipulated, and I'll do it now officially, that

[3] we will agree to telephone depositions of those surveyors and

[4] we will pay to fly them to New York for trial. I actually

[5] overstated that in my brief. I think I said I would fly all

[6] Georgia witnesses to trial, but that would leave me open to

[7] him, you know, nominating a hundred witnesses, so I want to be

[8] a little careful. But we certainly would pay to fly all of the

[9] surveyors to trial in New York and also this Mr. Robinson who

[10] was involved with the salvage. Now the issue he makes there

[11] is, well, so plaintiff will pay to fly them here but maybe they

[12] won't come. In fact, the surveyors work for the railroad. I

[13] mean, they hire them to do this. I've never had a surveyor say

[14] he doesn't want to make more money to fly to New York.

[15]      THE COURT: I think they are witnesses who are used to

[16] this kind of thing.

[17]      MR. MALOOF: Yes. And all of those companies have

[18] offices in New York.

[19]      THE COURT: You don't need to say anymore. I know

[20] what I'm going to do.

[21]      MR. MALOOF: Okay.

[22]      THE COURT: The motion is denied. The motion to

[23] transfer is denied. It seems to me that there is not a lot of

[24] dispute on the facts. I don't hear a substantial quarrel with

[25] the chart in the plaintiff's memorandum on pages 4 and 5. The

Page 19

[1] condition at origin, the witnesses are in Japan and China. The

[2] witnesses with respect to the derailment are in Texas. That

[3] may or may not be part of the case. I mean, at the moment it

[4] is part of the case. And potentially there could be a lot of

[5] witnesses there; and California, worldwide, etc., that would be

[6] the same. So really, what it boils down to is New York versus

[7] Georgia.

[8]      In favor of transfer is the fact that the surveyors

[9] are nonparties, but they're professional witnesses in the sense

[10] that this is what they do, they're surveyors, and all the time

[11] surveyors are involved in litigation where they have to travel.

[12] I mean, I don't think it's a big deal for them. I can't

[13] imagine that they would refuse to travel to New York to testify

[14] at trial. They can certainly be subpoenaed in Georgia for a

[15] deposition, a trial deposition.

[16]      There are witnesses in New York: Mr. Perfect, Mr.

[17] Costanzo. They don't have firsthand knowledge but they are the

[18] ones who evaluated the claims, they're the ones who decided how

[19] much to pay out. So indeed, they are witnesses on damages.

[20] And I think they essentially balance each other out.

[21]      I don't think the operative facts really are in

[22] Georgia. If you look at the new case, for example, the

[23] surveyors are in Tennessee. It's just where it happened to

[24] wind up.

[25]      I think I agree that there is less deference given to

Page 20

[1] the plaintiff's choice, but there still has to be some

[2] deference; there still is some deference. In addition, this is

[3] a district where the defendants do business, they're subject to

[4] jurisdiction here, they operate in the Southern District.

[5]      I think the Carmack venue provision, I don't know if

[6] it's a -- I'll call it a choice of forum selection clause, but

[7] it makes it clear that the railroads are subject to

[8] jurisdiction where they operate.

[9]      I think clearly a substantial part of the defendants'

[10] desire to move is the law, the state of the law. This is not

[11] exactly the same as the Van Dusen case in that the plaintiffs

[12] would not be without a remedy, but it potentially could be a

[13] substantially curtailed remedy. But I think really, the

[14] motivation here is not the convenience of the parties or the

[15] witnesses, the motivation is the law.

[16]      And for all these reasons, I find that the interests

[17] of justice support keeping the case here in New York. I do not

[18] find that the convenience of the witnesses and parties would be

[19] better served in Atlanta. Accordingly, the transfer motion is

[20] denied.

[21]      The next motion?

[22]      MR. EAGAN: Good morning, your Honor. Thomas Eagan

[23] for the plaintiffs.

[24]      THE COURT: This one is a little bit more complicated.

[25]      MR. EAGAN: Yes. What we've done on this motion too

$\mathcal{M} \mathcal{OL}$

## Combined Transport Bills of Lading

RECEIVED in apparent external good order and condition except as otherwise noted the total number of Containers or other packages or units enumerated below(*) for transportation from the Place of Receipt to the Place of Delivery subject to the terms hereof.

One of the original Bills of Lading must be surrendered duly endorsed in exchange for the Goods or Delivery Order unless otherwise provided herein.

In accepting this Bill of Lading the Merchant expressly accepts and agrees to all its terms whether printed, stamped or written, or otherwise incorporated, notwithstanding the non-signing of this Bill of Lading by the Merchant.

IN WITNESS whereof the number of original Bills of Lading stated below have been signed, one of which being accomplished, the other(s) to be void.

(Terms of Bill of Lading continued on the back hereof)

### 1.  DEFINITIONS

"Carrier" means Mitsui O.S.K. Lines, Ltd. on whose behalf this Bill of Lading has been signed.

"Merchant" includes the Shipper, Holder of this Bill of Lading, Consignee, Receiver of the Goods, any Person owning or entitled to the possession of the Goods or of this Bill of Lading and anyone acting on behalf of any such Person.

"Person" includes an individual, group, company or other entity.

"Sub-Contractor" includes owners and operators of Vessels and space providers of Vessels (other than the Carrier), stevedores, terminal and groupage operators, inland carriers, road, rail and air transport operators, any independent contractor directly or indirectly employed by the Carrier in performance of the Carriage, their respective servants and agents, and anyone assisting the performance of the Carriage.

"indemnify" includes defend, indemnify and hold harmless.

"Goods" means the whole or any part of the cargo received from the Shipper and includes any equipment or Container not supplied by or on behalf of the Carrier.

"Container" includes any container, trailer, transportable tank, flat or pallet and any equipment thereof or connected thereto.

"Carriage" means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods under this Bill of Lading.

"Freight" includes all charges payable to the Carrier in accordance with the applicable Tariff and this Bill of Lading.

"Hague Rules" means the provisions of the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August, 1924 and includes the amendments by the Protocol signed at Brussels on 23rd February, 1968, and the amendments by the Protocol signed at Brussels on 21st December, 1979, but only if such amendments (hereinafter collectively called "the Visby Amendments") are compulsorily applicable to this Bill of Lading (It is expressly provided that nothing in this Bill of Lading shall be construed as contractually applying the Visby Amendments).

"Waterborne Carriage" means the Carriage by sea or water, and includes the period during which the Goods are under the custody of the Carrier for the Carriage at the sea/water terminal of the Port of Loading or of the Port of Discharge, whether or not on board the Vessel.

"Port of Loading" means a port or place so named overleaf or any other port or place where the Goods are loaded onto the Vessel for the Carriage.

"Port of Discharge" means a port or place so named overleaf or any other port or place where the Goods are discharged from the Vessel for the Carriage.

"Place of Receipt" means a place so named overleaf where the Goods are received by the Carrier for the Carriage.

"Place of Delivery" means a place so named overleaf or any other place where the Goods are delivered by the Carrier to the Merchant in accordance with the terms hereof.

"Vessel" means the Ocean vessel named overleaf and includes vessel, ship, craft, lighter or other means of transport by sea or water which is or shall be substituted, in whole or in part, for the Ocean vessel named on the face hereof.



EXHIBIT 7

## 2. CARRIER'S TARIFF

The terms of the Carrier's applicable Tariff are incorporated herein. Copies of the relevant provisions of the applicable Tariff are obtainable from the Carrier upon request. In the case of inconsistency between this Bill of Lading and the applicable Tariff, this Bill of Lading shall prevail.

## 3. LIMITATION STATUTES

Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption or limitation of liability authorized by any applicable laws, statutes or regulations of any country. The Carrier shall have the benefit of the said laws, statutes or regulations as if it were the owner of the Vessel.

## 4. SUB-CONTRACTING AND INDEMNITY

(1)The Carrier shall be entitled to sub-contract the Carriage on any terms whatsoever.

(2)The Merchant undertakes that no claim or allegation shall be made against any servant, agent or Sub-Contractor of the Carrier which imposes or attempts to impose upon any of them, or upon any vessel owned or operated by any of them, any liability whatsoever in connection with the Goods, and, if any such claim or allegation should nevertheless be made, to indemnify the Carrier against all consequences thereof. Without prejudice to the foregoing, every such servant, agent and Sub-Contractor shall have the benefit of all provisions herein benefiting the Carrier as if such provisions were expressly for their benefit; and, in entering into this contract, the Carrier, to the extent of those provisions, does so not only on its own behalf, but also as agent and trustee for such servants, agents and Sub-Contractors.

(3)The provisions of Clause 4 (2) including but not limited to the undertakings of the Merchant contained therein, shall extend to claims or allegations of whatsoever nature against other Persons chartering space on the carrying Vessel.

## 5. CARRIER'S RESPONSIBILITY

The Carrier shall not be responsible for loss or damage to the Goods occurring before the receipt of the Goods by the Carrier at the Place of Receipt or after the delivery of the Goods to the Merchant and the Carrier shall be liable for loss or damage to the Goods occurring between the time when he receives the Goods for transportation at the Place of Receipt and the time of delivery only to the extent set out below.

(1)If the stage of the Carriage during which the loss or damage occurred can be proved, the liability of the Carrier shall be determined:

(a) if the loss or damage is proved to have occurred during the Waterborne Carriage, by the Hague Rules, Articles 1-8 inclusive, but excluding Article 1(e),

(b) except where the loss or damage is proved to have occurred during the Waterborne Carriage, by the provisions contained in any international convention or national law which provisions,

1) cannot be departed from by private contract to the detriment of the Merchant; and

2) would have applied if the Merchant had made a separate and direct contract with the Carrier in respect of the particular stage of the Carriage during which the loss or damage occurred and received as evidence thereof any particular document which must be issued in order to make such international convention or national law applicable; and

3) would have been applicable if the contract referred to in 2) above had been governed by the internal law of the State where the loss or damage occurred.

(2)If neither Clause 5 (1)(a) or (b) above apply, or if the stage of the Carriage during which the loss or damage occurred cannot be determined:

(a) the Carrier shall be relieved of liability for any loss or damage if such loss or damage was caused by;

(i) act of God,

(ii) act of War,

(iii) act of public enemies,

(iv) arrest or restraint of princes, rulers or people or seizure under legal process,

(v) quarantine restrictions,

(vi) an act or omission of the Merchant,

(vii) compliance with instructions of any Person entitled to give them,

(viii) insufficiency of or defective condition of packing or marking,

(ix) handling, loading, stowage or unloading of the Goods by or on behalf of the Merchant,

(x) inherent vice of the Goods,

(xi) strike, lock-out, stoppage or restraint of labour, from whatever cause, whether partial or general,

(xii) riots and civil commotions,

(xiii) any cause or event which the Carrier could not avoid and the consequences whereof he could not prevent by the exercise of reasonable diligence.

(b) Burden of Proving

The burden of proving that the loss or damage was due to one or more of the causes specified in this Clause 5(2)(a) shall rest upon the Carrier, save that if the Carrier establishes that, in the circumstances of the case, the loss or damage could be attributed to one or more of the causes or events specified in Clause 5(2)(a) other than (vi), (vii) or (xiii), it shall be presumed that it was so caused. The Merchant shall, however, be entitled to prove that the loss or damage was not, in fact, caused either wholly or partly by one or more of these causes or events.

(c) Limitation of Liability

Except as provided in Clauses 6(1), 6(2), and 29, if Clause 5(2) operates, total compensation shall in no circumstances exceed 2 SDRs per kilo of gross weight of the Goods lost or damaged (SDR means Special Drawing Right as defined by the International Monetary Fund).

(3)Contribution of Liability

Where loss or damage is caused partly by a cause for which the Carrier is liable and partly by a cause for which the Carrier is not liable, the Carrier shall be liable only for the portion of the loss or damage proved by the Merchant to have been produced by the cause for which the Carrier is liable.

(4)Notice of Loss or Damage

Unless notice of loss or damage to the Goods and the general nature of it be given in writing to the Carrier at the Place of Delivery before or at the time of the removal of the Goods into the custody of the Person entitled to delivery thereof under this Bill of Lading, or if the loss or damage be not apparent, within three working days thereafter, such removal shall be prima facie evidence of the delivery by the Carrier of the Goods as described in this Bill of Lading.

(5)Time-bar

The Carrier shall be discharged from all liability unless suit is brought and notice thereof given to the Carrier within one year after delivery of the Goods or, if the Goods are totally lost, after the date when the Goods should have been delivered.

## 6. SUNDRY LIABILITY PROVISIONS

(1)Hague Rules Limitation

If the Hague Rules are applicable by national law, the liability of the Carrier shall in no event exceed the limit provided in the applicable national law. If the Hague Rules are applicable otherwise than by national law, the liability of the Carrier shall in no event exceed 100 pounds sterling per package or unit.

(2)Ad Valorem

Higher compensation may be claimed only when, with the consent of the Carrier, the value for the Goods declared by the Shipper which exceeds the limits laid

down in this Bill of Lading has been stated in the declared value box on the face of this Bill of Lading and, if applicable, the ad valorem freight has been paid. In that case the amount of the declared value shall be substituted for that limit. Any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

(3) Delay and Consequential Damages

The Carrier does not undertake that the Goods shall arrive at the Place of Delivery at any particular time or to meet any particular market or use, and the Carrier shall in no circumstances be liable for delay or for any indirect or special or consequential loss or damage incurred by the Merchant.

(4) Scope of Application

(a) Save as otherwise expressly provided herein, the Carrier shall not be liable in any circumstances or in any capacity whatsoever for any loss or damage, howsoever arising out of or in connection with the Carriage or the supply of the Container.

(b) The terms of this Bill of Lading shall govern the relations between the Carrier and the Merchant in respect of the Carriage, whether a Bill of Lading is issued or not.

(5) Defences and Limits for the Carrier

The defences and limits of liability provided for in this Bill of Lading shall apply in any action against the Carrier for loss or damage to the Goods, whether the action be founded in contract or in tort.

(6) Agency

Where on the face of this Bill of Lading any place of destination is shown and is different from the Place of Delivery, the Carrier shall not be liable in any capacity whatsoever for loss, damage or delay of or to the Goods after the delivery at the Place of Delivery. In these circumstances the Carrier in making arrangements with a Person or carrier for or in connection with transhipping or forwarding of the Goods to the place(if requested by the Merchant and so agreed by the Carrier) acts as agent only for the Merchant and the Merchant shall indemnify the Carrier for all charges and expenses therefor. If, for any reason, the Carrier is denied the right to act as agent only at these times, his liability for loss, damage or delay of or to the Goods shall be determined in accordance with this Bill of Lading.

(7) NVOCC

If this Bill of Lading is accepted by a non vessel operating common carrier (NVOCC), who has in turn made other contracts of carriage with third parties, the said NVOCC hereby;

(a) undertakes that no claim or allegation in respect of the Goods shall be made against the Carrier by any Person other than in accordance with the terms hereof which imposes or attempts to impose upon the Carrier or any vessel owned or operated by the Carrier any liability whatsoever in connection with the Goods, whether or not arising out of negligence on the part of the Carrier, and if any such claim or allegation should nevertheless be made, to indemnify the Carrier against all consequences thereof, and

(b) warrants that all bills of lading or other documents recording the contracts of carriage issued by him in respect of the Goods shall incorporate the terms of this Bill of Lading including the law and jurisdiction clause, and agrees to indemnify the Carrier, his servants, agents and Sub-Contractors against all consequences of his failing so to incorporate.

(8) HAMBURG RULES

(a) Notwithstanding the terms of Clause 25 herein if proceedings are brought before the courts of a Contracting State to the United Nations Convention on the Carriage of Goods by Sea 1978 (the Hamburg Rules) or the courts of any State whose national legislation makes the Hamburg Rules effective and if such courts adjudge the Hamburg Rules or such national legislation to be compulsorily applicable to this Bill of Lading, then in those circumstances only shall this Bill of Lading take effect subject to the Hamburg Rules or such national legislation and any term of this Bill of Lading derogating therefrom to the detriment of the

Merchant shall be void to that extent but no further.
    (b) In any event the Carrier shall be entitled to contest enforcement of any judgement made in a Contracting State to the Hamburg Rules in any proceedings before courts in a Non-Contracting State.

## 7. MERCHANT-PACKED CONTAINERS
If a Container has not been packed or filled by or on behalf of the Carrier:
    (1)The Carrier shall not be liable for loss or damage to the Goods and the Merchant shall indemnify the Carrier against any loss, damage, liability or expense incurred by the Carrier, if such loss, damage, liability or expense has been caused by;
    (a) the manner in which the Container has been packed or filled, or
    (b) the unsuitability of the Goods for the Carriage in the Containers, or
    (c) the unsuitability or defective condition of the Container which would have been apparent upon reasonable inspection by the Merchant at or prior to the time when the Container was filled or packed.
    (2)The loading of the Container by the Merchant shall be prima facie evidence that the Container was sound and suitable for use and the Merchant agrees that he will return the Carrier's Container in the same condition as received. Any loss or damage caused to the Container supplied by the Carrier while in the possession of the Merchant is for the account of the Merchant.
    (3)If the Container is delivered with seals intact, such delivery shall be deemed as full and complete performance of the Carrier's obligation hereunder and the Carrier shall not be liable for any loss or damage to the Goods.

## 8. INSPECTION OF GOODS
    (1)The Carrier shall be entitled, but under no obligation, to open any Container or package at any time and to inspect, reweigh, remeasure, revalue or repack the Goods without notice to the Merchant.
    (2)If Clause 8 (1) applies or if by order of the authorities at any place, a Container or package has to be opened, the Carrier will not be liable for any loss or damage incurred as a result of any opening, unpacking, inspection, reweighing, remeasurement, revaluation, or repacking. The Merchant shall indemnify the Carrier for the cost of all measures taken as above.

## 9. DESCRIPTION OF GOODS
    (1)This Bill of Lading shall be prima facie evidence of the receipt by the Carrier in apparent external good order and condition except as otherwise noted of the total number of Containers or other packages or units enumerated overleaf (*).
    (2)No representation is made by the Carrier as to the weight, contents, measure, quantity, quality, description, condition, marks, numbers or value of the Goods and the Carrier shall be under no responsibility whatsoever in respect of such description or particulars.
    (3)If any particulars of any Letter of Credit and/or Import Licence and/or Sale Contract and/or Invoice or Order Number and/or details of any contract to which the Carrier is not a party are shown on the face of this Bill of Lading, such particulars are included solely at the request of the Merchant for his convenience. The Merchant acknowledges that except when the provisions of Clause 6(2) apply, the value of the Goods is unknown to the Carrier, and that the inclusion of such particulars shall not be regarded as a declaration of value and in no way increases the Carrier's liability under this Bill of Lading. The Merchant further agrees to indemnify the Carrier against all consequences of including such particulars in this Bill of Lading.

## 10. MERCHANT'S RESPONSIBILITY
    (1)All of the Persons coming within the definition of Merchant in Clause 1 shall be jointly and severally liable to the Carrier for the due fulfillment of all obligations of the Merchant in this Bill of Lading.
    (2)The Merchant warrants to the Carrier that the particulars relating to the Goods as set

out overleaf have been checked by the Merchant on receipt of this Bill of Lading and that such particulars and any other particulars furnished by or on behalf of the Shipper are accurate and correct. The Merchant also warrants that the Goods are lawful goods and contain no contraband, are adequately packed and prepared for shipment, and will not cause loss, damage, or expenses to the Carrier, the Vessel, or to any other cargo during the Carriage.

(3)The Merchant shall indemnify the Carrier against all loss, damage, expenses and fines arising or resulting from any breach of any of the warranties in Clause 10(2) hereof or from any other cause whatsoever in connection with the Goods, unless the Merchant proves that the Carrier is responsible for them.

(4)The Merchant shall comply with all regulations or requirements of customs, port and other authorities, and shall bear and pay all duties, taxes, fines, imposts, expenses or losses incurred or suffered by reason of any failure to so comply, or by reason of any illegal, incorrect or insufficient marking, numbering or addressing of the Goods, and shall indemnify the Carrier in respect thereof.

## 11. FREIGHT

(1)Freight shall be deemed fully earned on receipt of the Goods by the Carrier, whether the Goods are lost or not, and shall be paid and non-returnable in any event.

(2)The Merchant's attention is drawn to the stipulations concerning currency in which the Freight is to be paid, rate of exchange, devaluation and other contingencies relative to Freight in the applicable Tariff.

(3)Freight has been calculated on the basis of particulars furnished by or on behalf of the Merchant. If the particulars furnished by or on behalf of the Merchant are incorrect, it is agreed that a sum equal to double the correct Freight less the Freight charged shall be payable as liquidated damages to the Carrier, provided that the Carrier's Tariff does not stipulate otherwise.

(4)All Freight shall be paid to the Carrier by the Merchant in cash without any set-off, counter-claim, deduction or stay of execution either at or prior to the time agreed for payment or at latest before delivery of the Goods.

(5)The Merchant shall be liable to the Carrier for the payment of all Freight and/or expenses including but not limited to court costs, legal fee and expenses incurred in collecting monies due to the Carrier. Payment of the Freight to a freight forwarder, broker or anyone other than the Carrier or its authorized agent shall not be deemed payment to the Carrier and shall be made at the Merchant's sole risk.

## 12. LIEN

The Carrier shall have a lien on the Goods and any documents relating thereto for all sums payable to the Carrier under this contract and for general average contributions, to whomsoever due. The Carrier shall also have a lien against the Merchant on the Goods and any documents relating thereto for all sums due from the Merchant to the Carrier under any other contract. For recovering any sums due, the Carrier shall have the right to sell the Goods by public auction or private sale, without notice to the Merchant. In any event any lien shall extend to cover the cost of recovering any sums due. The lien shall survive delivery of the Goods.

## 13. OPTIONAL STOWAGE AND DECK CARGO

(1)The Goods may be packed by the Carrier in Containers.

(2)The Goods packed in Containers (other than flats or pallets) whether by the Carrier or the Merchant, may be carried on or under deck without notice to the Merchant. All such Goods whether carried on deck or under deck shall participate in general average and such Goods (other than live animals) shall be deemed to be within the definition of the Goods for the purposes of the Hague Rules.

(3)Notwithstanding Clause 13(2), Goods which are stated herein to be carried on deck are carried without responsibility on the part of the Carrier for loss or damage of whatsoever nature arising during the Carriage whether caused by unseaworthiness or negligence or any other cause whatsoever.

## 14. LIVE ANIMALS

Live animals are carried without responsibility on the part of the Carrier for any accident, injury, illness, death, loss or damage arising at any time whether caused by unseaworthiness or negligence or any other cause whatsoever. The Merchant shall indemnify the Carrier against any claim, loss, damage or expense arising in consequence of the Carriage of live animals.

## 15. SPECIALIZED CARRIAGE

(1)The Merchant undertakes not to tender for Carriage any Goods which require refrigeration, ventilation or any other special attention without previously giving written notice of their nature and particular temperature range to be maintained and/or special attention required. In the case of refrigerated, ventilated or any other specialized Container packed by or on behalf of the Merchant, the Merchant further undertakes that the Goods have been properly packed in the Container and that he has checked that its thermostatic, ventilating or any other special controls have been properly and exactly set, before receipt of the Goods by the Carrier. The Carrier shall not be liable for any loss or damage to the Goods arising out of or resulting from the Merchant's failure in such obligation and further does not guarantee the maintenance of any intended temperature inside the Container.

(2)The Carrier shall not be liable for any loss or damage to the Goods arising from latent defects, derangement, breakdown, defrosting, stoppage of the refrigerating, ventilating or any other specialized machinery, plant, insulation and/or any apparatus of the Container, vessel, conveyance and any other facilities, provided that the Carrier shall before and at the beginning of the Carriage exercise due diligence to maintain the Container supplied by the Carrier in an efficient state.

(3)If the Goods have been packed into a refrigerated Container by the Carrier and the particular temperature range requested by the Merchant is inserted in this Bill of Lading, the Carrier will set the thermostatic controls within the requested temperature range, but does not guarantee the maintenance of such temperature inside the Container.

## 16. METHODS AND ROUTES OF CARRIAGE

(1)The Carrier may at any time and without notice to the Merchant:

(a) use any means of carriage whatsoever,

(b) transfer the Goods from one conveyance to another, including transshipping or carrying them on a different vessel from that named overleaf,

(c) unpack and remove the Goods which have been packed into a Container and forward them in a Container or otherwise,

(d) proceed by any route in his discretion (whether or not the nearest or most direct or customary or advertised route) and proceed to or stay at any place or port whatsoever, once or more often and in any order,

(e) load and unload the Goods at any place or port (whether or not such port is named overleaf as the Port of Loading or Port of Discharge) and store the Goods at any such place or port,

(f) comply with any orders or recommendations given by any government or authority, or any Person acting or purporting to act as or on behalf of such government or authority, or having under the terms of any insurance on any conveyance employed by the Carrier the right to give orders or directions,

(g) permit the Vessel to proceed with or without pilots, to tow or be towed, or to be dry-docked, loaded or not.

(h) comply with the custom or practice of any port or place, whether legal, factual or commercial, whether prevailing locally, nationally, or internationally, and whether the Merchant personally knows of the custom or practice with regard to receiving, loading, stowing, keeping, carrying, discharging, and/or delivering Goods and, in particular, the Carrier shall be entitled to give delivery of the Goods without surrender of an original Bill of Lading in those jurisdictions

where such practice is recognized whether by custom or law. Compliance with such custom or practice shall be deemed to be proper performance of the contract of carriage hereunder.

(2)The liberties set out in Clause 16(1) may be invoked by the Carrier for any purpose whatsoever, whether or not connected with the Carriage including loading or unloading other goods, bunkering, undergoing repairs, adjusting instruments, picking up or loading any persons and assisting vessels in all situations. Anything done in accordance with Clause 16(1) or any delay arising therefrom shall be deemed to be within the Carriage and shall not be a deviation.

## 17. CARRIAGE AFFECTED BY CONDITION OF GOODS

If it appears at any time that, due to their condition, the Goods cannot safely or properly be carried or carried further, either at all or without incurring any additional expense or taking any measure(s) in relation to the Container or the Goods, the Carrier may without notice to the Merchant (but as his agent only) take any measure(s) and/or incur any additional expense to carry or to continue the Carriage thereof, and/or store them ashore or afloat, under cover or in the open at any place, whichever the Carrier, in his absolute discretion, considers most appropriate. Furthermore, the Carrier shall be entitled with or without notice to the Merchant to abandon the Goods whether in store or not, or to effect a sale or disposal of the Goods as may be necessary or appropriate. The Carrier's liability shall cease upon such abandonment, storage, sale or disposal. The Merchant shall indemnify the Carrier against any additional expense so incurred.

## 18. MATTERS AFFECTING PERFORMANCE

If at any time the Carriage is or is likely to be affected by any hindrance, risk, delay, difficulty or disadvantage of any kind and howsoever arising (even though the circumstances giving rise to such hindrance, risk, delay, difficulty or disadvantage existed at the time this contract was entered into or the Goods were received for the Carriage), the Carrier (whether or not the Carriage is commenced) may, without prior notice to the Merchant and at the sole discretion of the Carrier, either:

(a) Carry the Goods to the named Place of Delivery by an alternative route to that indicated   in this Bill of Lading or that which is usual for the Goods consigned to that Place of Delivery (If the Carrier elects to invoke the terms of this Clause 18(a), then notwithstanding the provisions of Clause 16 hereof, he shall be entitled to charge such additional Freight as the Carrier may determine); or

(b) Suspend the Carriage of the Goods and store them ashore or afloat upon the terms of    this Bill of Lading and endeavour to forward them as soon as possible, but the Carrier makes no representations as to the maximum period of suspension (If the Carrier elects to invoke the terms of this Clause 18(b) then he shall be entitled to such additional Freight as the Carrier may determine); or

(c) Abandon the Carriage of the Goods and place the Goods at the Merchant's disposal at   any place or port which the Carrier may deem safe and convenient, whereupon the responsibility of the Carrier in respect of such Goods shall cease. The Carrier shall nevertheless be entitled to full Freight on the Goods received for the Carriage, and the Merchant shall pay any additional costs of the Carriage to, and delivery and storage at, such place or port. If the Carrier elects to use an alternative route under Clause 18(a) or to suspend the Carriage under Clause 18(b), this shall not prejudice his right subsequently   to abandon the Carriage.

## 19. DANGEROUS GOODS

(1)The Merchant undertakes not to tender for transportation any Goods which are of a dangerous, inflammable, radio-active, or damaging nature without previously giving written notice of their nature to the Carrier and marking the Goods and the Container or other covering on the outside as required by any laws or regulations which may be applicable during the Carriage.

(2)If the requirements of Clause 19(1) are not complied with, the Goods may, at any time or place, be unloaded, destroyed, or rendered harmless without compensation and the Merchant shall indemnify the Carrier against all loss, damage or expense

arising out of the Goods being tendered for transportation or handled or carried by the Carrier. Further, the Carrier shall be under no liability to make any general average contribution in respect of such Goods.

(3)Whether or not the Merchant or the Carrier is aware of the nature of such Goods, the Merchant shall indemnify the Carrier against all claims, loss, damage or expenses arising in consequence of the Carriage of such Goods.

## 20. NOTIFICATION AND DELIVERY

(1)Any mention in this Bill of Lading of parties to be notified of the arrival of the Goods is solely for information of the Carrier, and failure to give such notification shall not involve the Carrier in any liability nor relieve the Merchant of any obligation hereunder.

(2)The Merchant shall take delivery of the Goods within the free storage time provided for in the Carrier's applicable Tariff or otherwise. If the Merchant fails to do so, without prejudice to any other rights of the Carrier hereunder, the Carrier may without notice unload the Goods or that part thereof from the Vessel or the Container and/or store the Goods or that part thereof ashore, afloat, in the open or under cover at the sole risk of the Merchant. Such storage shall constitute due delivery hereunder, and thereupon all liability whatsoever of the Carrier in respect of the Goods or that part thereof shall cease, and the costs of such unloading or storage (if paid or payable by the Carrier or any agent or Sub-Contractor of the Carrier) shall forthwith upon demand be paid by the Merchant to the Carrier.

(3)If the Merchant fails to take delivery of the Goods within 30 days of becoming due under Clause 20(2), or if in the opinion of the Carrier they are likely to deteriorate, decay, become worthless or incur charges whether for storage or otherwise in excess of their value, the Carrier may, without prejudice to any other rights which he may have against the Merchant, without notice and without any responsibility whatsoever attaching to him, sell, destroy or dispose of the Goods and apply any proceeds of sale in reduction of the sums due to the Carrier from the Merchant in respect of this Bill of Lading.

## 21. SPECIAL DELIVERY

The special arrangement for receiving the Goods as Full Container Load and delivering them as Less than Container Load (FCL/LCL) and/or for split delivery of the Goods to more than one receiver shall be undertaken by the Carrier at his absolute discretion and on condition that the Carrier shall not be liable for any shortage, loss, damage, or discrepancies of the Goods, which are found upon unpacking the Container. The Merchant shall be liable for an appropriate adjustment of the Freight and shall pay any additional cost incurred.

## 22. AMENDED JASON CLAUSE AND BOTH-TO-BLAME COLLISION CLAUSE
(The amended Jason clause)

In the event of an accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the Goods, and the Merchant shall jointly and severally contribute with the Carrier in general average to the payment of any sacrifices, loss or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the Goods. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully in the same manner as if the said salving vessels belonged to strangers.
(Both to Blame Collision Clause)

If the (carrying) Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default in the navigation or the management of the carrying Vessel, the Merchant undertakes to pay the Carrier, or, where the Carrier is not the owner and in possession of the carrying Vessel, to pay to the Carrier as trustee for the owner and/or demise charterer of the carrying Vessel, a sum sufficient to indemnify the Carrier and/or the owner and/or demise charterer of the carrying Vessel against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss

or damage to his Goods or any claim whatsoever of the Merchant, paid or payable by the other or non-carrying ship or her owners to the Merchant and setoff, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying Vessel or her owner or demise charterer or the Carrier. The foregoing provisions shall also apply where the owners, operators, or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact stranding or other accident.

## 23. GENERAL AVERAGE & SALVAGE

(1)Any general average on a Vessel operated by the Carrier shall be adjusted according to the York/Antwerp Rules of 1994 (or at the election of the Carrier, either York/Antwerp Rules 1974 as amended in 1990 or York/Antwerp Rules 2004) at any port or place and in any currency at the option of the Carrier. Any general average on a Vessel not operated by the Carrier (whether a seagoing or inland waterways Vessel) shall be adjusted according to the requirements of the operator of that Vessel. In either case the Merchant shall give such cash deposit or other security as the Carrier may deem sufficient to cover the estimated general average contribution of the Goods before delivery if the Carrier requires, or, if the Carrier does not so require, within three months of the delivery of the Goods, whether or not at the time of delivery the Merchant had notice of the Carrier's lien. The Carrier shall be under no obligation to exercise any lien for general average contribution due to the Merchant.

(2)All expenses in connection with a general average or salvage act to avoid damage to the environment always to be considered general average expenses.

(3)If salvage services are rendered to the Vessel and the Goods, then as soon as requested to do, the Merchant shall provide salvage security in the amount and in the form requested by the salvor or shall provide counter security to the Carrier if the Carrier has provided security to the salvor on behalf of the Merchant. In the event of any failure to provide security promptly, the Merchant shall indemnify the Carrier for all loss and expenses, including consequential loss caused by delay, suffered by the Carrier.

## 24. FIRE AND NUCLEAR INCIDENT

(a) The Carrier shall not be responsible for any loss or damage to the Goods arising or resulting from fire occurring at any time, unless caused by the actual fault or privity of the Carrier.

(b) The Carrier shall not be responsible for any loss or damage to the Goods arising or resulting from nuclear incident occurring at any time, unless caused solely by personal willful misconduct of the Carrier.

## 25. LAW AND JURISDICTION

The contract evidenced by or contained in this Bill of Lading shall be governed by Japanese law except as may be otherwise provided for herein. Unless otherwise agreed by the Carrier, any action against the Carrier thereunder must be brought exclusively before the Tokyo District Court in Japan. Any action by the Carrier to enforce any provision of this Bill of Lading may be brought before any court of competent jurisdiction at the option of the Carrier.

## 26. VARIATION OF THE CONTRACT

Any agreement for or in connection with the Carriage of the Goods is superseded by this Bill of Lading. No servant or agent of the Carrier shall have the power to waive or vary any of the terms of this Bill of Lading unless such waiver or variation is in writing and is specifically authorized or ratified in writing by the Carrier.

## 27. VALIDITY

In the event that anything herein contained is inconsistent with any applicable international convention or national law which cannot be departed from by private contract, the provisions hereof shall be null and void to the extent of such inconsistency but no further.

## 28. WAIVER

Non-performance or delay by the Carrier in exercising its rights for any period of time under

this Bill of Lading shall not be a waiver of any of the Carrier's rights.

**29. US CLAUSE PARAMOUNT**

(1) If the Carriage covered by this Bill of Lading includes Carriage to or from a port or place in the United States of America, this Bill of Lading shall be subject to the United States Carriage of Goods by Sea Act 1936 (US COGSA), the terms of which are incorporated herein and shall govern throughout the entire Carriage set forth in this Bill of Lading. Neither Clause 5(1)(a),(b), the Hamburg Rules nor the Visby Amendments shall apply to the Carriage to or from the United States. The Carrier shall be entitled to the benefits of the defences and limitations in US COGSA, whether the loss or damage to the Goods occurs at sea or not.

(2) If the US COGSA applies as Clause 29(1) above, neither the Carrier nor the Vessel shall, in any event, be or become liable for any loss or damage to or in connection with the Goods in an amount exceeding $500.00 per package, lawful money of the United States, or in case of Goods not shipped in packages, per customary freight unit unless the value of the Goods has been declared and inserted in the declared value box on the face hereof, in which case Clause 6 (2) shall apply.

## 8.    Damage and Loss to Shipments

## 8.1  Overview

**8.1.1 Cross reference**

This information replaces former NS Rule 10, 16, 17.5, and former Conrail Items 150, 255, and 250 dated prior to June 1, 1999.

**8.1.2 Purpose**

The purpose of this section is to state NS liability provisions with respect to:

- Damages to or loss or delay of lading, and
- filing claims and litigation regarding damage to or loss or delay of lading.

**8.1.3 In this section**

The following topics will be covered in this section:

| Topic | Section |
|-------|---------|
| General Terms and Conditions | 8.2 |
| Standard Liability Provisions and Restrictions | 8.3 |
| Carmack Liability Provisions | 8.4 |
| Claims Filing and Processing | 8.5 |
| Joint Line Claims | 8.6 |
| Other Rights and Responsibilities | 8.7 |



EXHIBIT 8

## 8.2   General Terms and Conditions

**8.2.1 Generally Applicable Provisions**

The following terms and conditions apply to all intermodal shipments via NS.

1. This rule supersedes any inconsistent provision elsewhere in this circular.
2. Except when inconsistent with any provision of this circular, all terms and conditions of the Uniform Bill of Lading (published in the Uniform Freight Classification in effect at the time of shipment) shall apply to all shipments under this circular.
3. NS offers two alternative liability provisions: "Standard" liability and "Carmack" liability. UNLESS LANGUAGE EXPRESSLY SELECTING "CARMACK" IS INCLUDED IN THE ORIGINAL SHIPPING INSTRUCTIONS, ANY TENDER OF FREIGHT FOR TRANSPORTATION UNDER THIS CIRCULAR WILL BE ACCEPTED UNDER "STANDARD" LIABILITY COVERAGE PROVIDED AND NOT UNDER "CARMACK" COVERAGE.
4. Other levels of reimbursement for cargo loss or damage are available only by written contract signed by an authorized NS official.

Norfolk Southern Intermodal Rules Circular #2
Section 8 – Damage and Loss to Shipments

## 8.3   Standard Liability Provisions and Restrictions

**8.3.1 General liability**

Subject only to the:

- liability restrictions and limitations in this Standard Liability section,
- provisions of the Uniform Bill of Lading, and
- claim, arbitration and suit filing requirements outlined in the "Claims Filing and Processing" and "Other Rights and Responsibilities" sections below.

NS will pay all claims for loss or damage to freight transported by an NS carrier under this circular.

**8.3.2 Damage claim restrictions**

NS will not be liable for any damage to lading unless that lading moved under this circular and the claimant establishes that either

1. the damage was caused by moisture entering a container or trailer supplied and owned or leased by a NS carrier or another railroad ("Railroad Furnished Container or Trailer") through a defect in the container or trailer, or
2. both
   a) the Shipper loaded shipment in closed, locked and secure trailer and / or container, and was properly loaded, blocked and braced, as provided in the Shipment Section and
   b) the damage occurred, more probably than not, while the lading was in possession of either NS or another carrier which has a contract with NS governing the allocation of such claims.

*Continued on next page*

## 8.3  Standard Liability Provisions and Restrictions, Continued

**8.3.3 All claims restrictions**

The following provisions apply to all claims except as otherwise described in the "Carmack Liability" section below:

a) As a condition precedent to any right to recovery for loss, damage, or delay to cargo, a written claim must be filed within 12 months after delivery of a shipment (or if delivery is not made, within 12 months after a reasonable time for delivery). A claim must include a demand for payment of a specific amount and information sufficient to identify the shipment.

b) NS carriers will not be held liable for any claims or losses; whether direct, indirect, special, consequential or punitive, that result from delay or an interruption of rail services, nor does the Carrier guarantee rail services on any schedules, published, projected or implied.

c) NS carriers do not guarantee adherence to any particular transit or train schedule. NS will not be liable for failure to transport any shipment by any particular train or in time for any particular market.

d) NS carriers NS will not be liable for loss, damage, or delay caused by:
   - an act of God
   - a public enemy
   - the authority of law
   - riots
   - strikes
   - acts of civil disobedience
   - an inherent quality or characteristic in the commodity
   - natural shrinkage
   - an act or default of shipper, consignor, consignee, owner, or any contracting party, or
   - the stoppage and holding in transit of lading at the request of the shipper, consignor, consignee, owner, or any contracting party.

   However, if any loss or damage arises both from NS carrier negligence and from an act or omission of any other party involved in the transportation process (such as shipper, consignor, consignee, owner, another railroad, contracting party, etc.), NS will be liable for that portion of the loss or damage caused by NS carrier negligence.

e) NS's liability will not extend beyond the actual physical loss or damage to the cargo itself, plus any costs reasonably incurred in efforts to mitigate the loss or damage. NS will not be liable for attorney fees (except to the extent permitted in "Lawsuits and Arbitrations" in the "Other Rights and Responsibilities" sections below), for interest, or for special, consequential, indirect or punitive damages. Unless amended by written agreement signed by an authorized NS official prior to shipment (see "Counteroffer" in Terms and Conditions" in "General Contract Conditions" section), NS's liability for loss, damage or delay to any shipments under this circular shall be limited to the lesser of the destination value of the cargo or $250,000.

Norfolk Southern Intermodal Rules Circular #2
Section 8 – Damage and Loss to Shipments

## 8.3  Standard Liability Provisions and Restrictions, Continued

**8.3.3 All Restrictions (continued)**

f) NS shall not be liable for any claims of less than a minimum claim amount of $250.

g) NS does not make any representations as to the suitability of cargo for rail transportation. The Shipper acknowledges also that there are significant differences in the forces exerted on the cargo in rail transportation that may require additional packing measures for the cargo to move safely. NS does not provide mechanical protective service under this circular. NS is not liable for temperature related damage to cargo itself or to the container or trailer or other equipment, regardless of whether shipper requested mechanical protective service or made such arrangement with another carrier or company, and no failure to take any action with regard to protective service shall constitute carrier negligence under paragraph (c) of "All Claims Restrictions" or otherwise.

h) NS will not be liable for any loss, damage or delay arising from any defect in trailer or container (including chassis and tie down devices and equipment), unless it is a railroad furnished container or trailer.

i) NS will not be liable for more than $250 per shipment for that portion of any claim attributable to federal or state taxes or duties on distilled spirits, wine, or beer.

j) NS will not be liable for any loss, damage, or delay to lading to any party other than the Rail Services Buyer. NS will not be under any obligation to process any claim by any person other than the Rail Services Buyer.

k) NS will not be liable for damage to lading due to the position (open or closed) of vent openings of vented trailers, nor will NS be responsible for monitoring the position of said vents while the unit is in its possession, nor will NS be liable for damage to lading as a result of vents admitting rain, snow, dirt, etc.

l) NS will not be liable for damage arising from atmospheric conditions when articles loaded on open-top or flatbed trailers are not adequately covered. Protective covering must be furnished and installed by the consignor.

m) As a condition precedent to any right to recovery for reimbursement for repairs to equipment, a written claim must be filed within 12 months after delivery of a shipment (or if delivery is not made, within 12 months after a reasonable time for delivery). A claim must include a demand for payment of a specific amount and information sufficient to identify the repairs made.

## 8.4  Carmack Liability Provisions

**8.4.1 Carmack liability**

The following provisions apply to shipments made under Carmack Liability.

1. For freight accepted under Carmack liability provision, NS carriers will have traditional, common law carrier liability as codified in 49 U.S.C. 11706 (the "Statute"). Carmack Liability is offered only for shipments which would have been subject to the Statute if intermodal traffic were not exempt from the Statute, and not for any foreign, ocean or other movement to which the Statute is otherwise inapplicable.
2. To the extent permitted by the Statute, NS carriers adopt all of the provisions for "Standard" Liability. As one example, the time limit for filing claims under "Standard" Liability applies to "Carmack" coverage under this section as well as to "Standard" coverage.
3. Any provision of the "Standard" Liability provision section which is not permitted by the Statute shall not apply to Carmack coverage under this section. As one example, the $250,000 limitation of liability coverage under Standard Liability does not apply to any shipment under Carmack coverage.
4. Rates for shipments subject to this circular do not include Carmack coverage, unless the rate quote expressly states otherwise in writing. Carmack coverage may be obtained through a negotiated special rate authority, but in no case will be less than the applicable FAK rate plus 50% of that rate. Payment for Carmack coverage for a shipment shall be subject to all of the same terms and conditions, including due date, that govern payment of the basic freight charges on that shipment.

Norfolk Southern Intermodal Rules Circular #2
Section 8 - Damage and Loss to Shipments

## 8.5  Claims Filing and Processing

**8.5.1 Claim Content**

1) In any claim for loss, damage, or delay, claimant shall include:
   a) equipment initials and number, shipper's name, consignee's name, notify party's name, shipping date, and commodity
   b) records (such as bill of lading, shipping manifest, or purchase or sales documents) or certification to establish
      (1) delivery to a NS carrier
      (2) the level of NS cargo claim coverage contracted for the shipment if other than Standard, and
      (3) condition and quantity of cargo at origin
   c) verification of the amount claimed, such as repair bills or certified invoices, and
   d) verification that claimant is the party entitled to payment of the claim.

2) Except where otherwise necessitated by wreck or derailment, claimant shall also include in any such claim:
   a) records verifying condition and quantity of the cargo when received at the destination stated in the shipping instructions
   b) origin and destination seal records, and
   c) evidence of disposition of any damaged cargo in compliance with requirements of this section.

**8.5.2 Where to file claims**

Claimants must file any claims for loss, damage or delay to lading with:

Norfolk Southern Corporation
National Customer Service Center Freight Claim Settlement
Attn: Intermodal Claims
185 Spring Street, SW, Box 153
Atlanta, GA  30303-0153

**8.5.3 Where to call**

For answers to any questions about claim filing, claimants may call this toll free number:

(800) 742-6315

## 8.6  Joint Line Claims

**8.6.1 Carmack coverage**

For through rail shipments over both NS carriers and other non-NS carrier(s) ("Interline Shipments"), Carmack coverage is available only if the contract for carriage for the Interline Shipment over the non-NS rail carrier(s) also includes Carmack coverage. Carmack coverage is not available for any foreign, ocean or other inland part of a movement if that part of the movement would not have been subject to the Statute in the case of regulated shipments.

**8.6.2 All claims**

NS's liability for any Interline Shipment (and for the inland portion of any ocean/inland through shipment) shall not exceed the liability of any other carrier in the movement unless claimant can establish that the loss, damage or delay creating liability occurred while the Interline Shipment was in the possession of NS Carriers.

## 8.7    Other Rights and Responsibilities

| | |
|---|---|
| **8.7.1 Origin rights and responsibilities** | Unless special loading, bracing, and blocking for a particular shipment is approved in advanced and in writing by an authorized NS official, all loading, bracing, and blocking must comply with all applicable AAR rules, circulars, pamphlets and/or general information series publications and with all applicable NS loading pamphlets, diagrams, manuals, publications, and/or procedures. NS has the right to inspect, weigh and reject shipments at origin for not complying with any applicable loading requirements. |
| **8.7.2 Mitigation of damages and salvage** | Claimants and all other contracting parties must mitigate damages as much as possible. Whenever possible, consignees should accept damaged cargo. When NS is liable for cargo damage and the associated salvage is retained by consignee or claimant, NS will reimburse claimant for all expenses reasonably incurred in disposing of the cargo. In computing the claim amount due, a credit for retained salvage will be allowed at the actual, fair market value of the retained lading at the time of delivery and in its damaged condition. |

*Continued on next page*

## 8.7   Other Rights and Responsibilities, Continued

8.7.3
Notification
and
verification

The following provisions apply to notification and verification of damage:

(a) Claims for less than $250 are not to be reported. If damage in excess of $250 is visible or obvious upon unloading and appears to be associated with a defect in the trailer or container, claimant must arrange for the destination railroad to be notified as soon as commercially practical and no later than by the end of the next working day following discovery of the damage. In all other cases of discovery of damage in excess of $250 (including "concealed" damage), the destination railroad must be notified within five working days after delivery.

(b) Notification of damaged cargo must comply with the procedures contained in the NS form "Procedures and Form for Lading Loss or Damage Notification", and include, at a minimum, complete responses to each of the items listed under the "Information Needed" portion of that attachment. To obtain the NS form "Procedures and Form for Lading Loss or Damage Notification" please contact our Claims department at 1-800-742-6315.

(c) Consignee shall keep damaged lading available for inspection by the destination railroad for 15 days after notification unless the destination railroad approves prior disposition. NS will not unreasonably withhold approval for prior disposition of salvage without destination inspection.

(d) Failure of the destination railroad to inspect damaged cargo for any reason will not relieve the claimant from the requirement of establishing that cargo was delivered in a damaged condition and was properly blocked and braced. Failure of the destination railroad to inspect damaged cargo for any reason will not be considered an admission of liability by NS.

*Continued on next page*

## 8.7   Other Rights and Responsibilities, Continued

**8.7.4 Lawsuits and arbitration**   The following provisions apply to lawsuits and arbitration:

(a) As a condition precedent to any right of recovery, any lawsuit or arbitration proceeding involving a claim for loss, damage or delay to cargo must be commenced within one year after receipt of written notice from NS declining the claim in full or in part. If suit is not filed or request for arbitration received by NS within that one-year period, claimant shall have no right of recovery.

(b) Lawsuits shall be filed only in a court of competent jurisdiction in Roanoke, Virginia; Norfolk, Virginia; Atlanta, Georgia; or Chicago, Illinois, or at the NS origin or NS destination of the Shipment on which the claim was made; or at any location on NS where the loss, damage or delay is known to have occurred.

(c) If an amount in dispute between NS and claimant is less than $100,000, both claimant and NS shall have a right to mandatory arbitration under "Other Rights and Responsibilities" section, and claimant will not file any lawsuit against NS or any NS Carrier, except as may be necessary to require NS or a NS Carrier to comply with the arbitration provisions of this "Other Rights and Responsibilities" section. This agreement to arbitrate and waiver of right to sue for less than $100,000 may be enforced by an action for injunction of specific performance.

(d) In the event of arbitration, NS will select a forum and procedure which will provide competent, impartial, and independent arbitrator(s). Except as provided in following paragraph (e), each party will bear its own expenses of preparing for arbitration, and the costs of arbitration itself shall be divided evenly, except that if the arbitrator(s) find either NS or the claimant to be asserting a position completely without merit, that party will pay all costs and expenses of the arbitration itself. If either claimant or NS files suit for recovery for, or determination of rights with regard to, loss, damage or delay to cargo other than a suit to enforce arbitration, the party filing that suit shall pay all of the other party's costs and expenses arising from or in connection with the resulting litigation, including attorney fees.

(e) If the amount in dispute between NS and claimant is less than $500, all costs and expenses of the arbitrating entity and its arbitrator(s) shall be borne (1) by NS if the arbitrator(s) finds that NS's position in declining the claim was clearly inaccurate or clearly contrary to the weight of the evidence, or (2) by the claimant in all other cases.

NS 0083

Norfolk Southern Intermodal Rules Circular #2
Section 8 – Damage and Loss to Shipments

# 8.8   Additional Terms And Conditions For Shipments Moving Into And Out Of Mexico

All shipments being transported over the lines of NS where the ultimate rail origin or rail destination is located in Mexico are subject to the following additional terms and conditions:

(1) NS assumes no responsibility for any loss of or damage to the lading occurring in Mexico.

(2) NS and connecting United States rail carriers will not be responsible for unlocated loss of or damage to the lading unless the claimant can show by preponderance of the evidence that the loss of or damage to the lading occurred in the United States.

(3) All claims for loss of or damage to lading occurring in Mexico must be presented to the Mexican rail carrier. Filing of claim with the Mexican rail carrier does not constitute filing of claim with NS or another United States rail carrier for the purposes of these Rules.

(4) It is the duty of the Shipper to provide all necessary documents, permits, authorizations and other paperwork required for the shipment to enter or leave the United States or Mexico.

(5) NS assumes no responsibility for any expenses or losses incurred by Shipper or Consignee that result from delays and problems in clearing Customs.

(6) All freight rates quoted from shipments moving into or out of Mexico are limited liability rates. Unless otherwise expressly agreed to in writing by NS, the maximum liability of NS and the other participating United States rail carriers in the movement shall be the lesser of the maximum liability established by the limited liability rate set by the Mexican rail carrier or carriers and the maximum liability of $250,000 US established by Rule 8.3.3.e. of this Intermodal Rules Circular. By agreeing to ship lading pursuant to the quoted freight rate, Shipper acknowledges that it has had the opportunity to request a full Carmack liability rate for shipments originating in the United States and has elected to not so in exchange for a reduced freight rate.

(7) In the event of a conflict between the terms of this sub-Rule 8.8 and the other terms and conditions of Rule 8, the terms of this sub-Rule 8.8 will govern.

(8) This Rule also applies to loss and damage to lading occurring during the Mexican drayage portion of the movement where such drayage is covered by a rail through bill of lading covering the origin or destination drayage of the lading in Mexico.

# TRANSPORTATION,
# LOGISTICS AND THE LAW

BY

WILLIAM J. AUGELLO, ESQ.

Edited by
George Carl Pezold, Esq.

Published by the
Transportation Consumer
Protection Council, Inc.
Huntington, NY

EXHIBIT **9**

### 5.    Captive Shippers

The mergers and acquisitions of railroads and rail lines since the Staggers Rail Act of 1980 have been substantial.[49]    In 1980, the four largest Class I railroads accounted for only 43% of rail traffic. By 1998, four mega-railroads accounted for 95% of the industry's traffic.[50]  Consolidation of the railroad system into a handful of major railroads has created many complaints from shippers that they are now captive to one railroad and thus have no competitive transportation services. In these cases, shippers seek the imposition of conditions in Surface Transportation Board (STB) merger application proceedings to grant competitors access to those shippers. The Board repealed the product and geographic competition tests of the market dominance rules.[51] The Board also issued rules giving shippers and smaller railroads opportunities to obtain service from alternate carriers during periods of poor service.[52] 49 C.F.R. § 1144 and *Ex Parte No. 575*, April 17, 1998.

### 6.  Rate Litigation

The STB continues to hear complaints regarding railroads' pricing standards and proposals for modification of formulas, such as "stand-alone costs," "revenue-to-variable costs," "comparison tests," "average revenue-to-variable cost above 180%," "constrained market pricing guidelines", etc. In the so-called "bottleneck decision,"[53] the STB ruled that a shipper may only challenge the rate over the entire route from origin to destination and not just the portion over which it has no competitive alternative.  Since 1987, railroad revenue adequacy has been measured with a single standard based on

---

[49] For an extensive review of the history of railroad mergers, see Frank N. Wilner, *Railroad Mergers, Analysis, Insight (1997)*.

[50] The major railroads operating as of this writing were the Union Pacific-Southern Pacific, Burlington Northern-Sante Fe, CSX Corp, Norfolk Southern, Kansas City Southern, Florida East Coast Industries, Canadian Pacific and Canadian National.

[51] *Market Dominance Determinations – Product and Geographic Competition*, STB Ex Parte No. 627, Dec. 21, 1988

[52] *Relief for Service Inadequacies, STB Ex Parte No. 628*, Dec. 21, 1998

[53] *Central Power & Light v. Southern Pacific Transportation Co.,* STB Docket No. 41242 et al., 1996 STB LEXIS 358.

DAVID T. MALOOF (DM 3350)
THOMAS M. EAGAN (TE 1713)
MALOOF BROWNE & EAGAN LLC
411 Theodore Fremd Avenue, Suite 190
Rye, New York 10580-1411
(914) 921-1200
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| NIPPONKOA INSURANCE CO., LTD., U.S. BRANCH, | 08 Civ. 1302 (PAC) |
| *Plaintiffs,*<br>- against - |  |
| NORFOLK SOUTHERN RAILWAY COMPANY, | **DECLARATION OF**<br>**SHARON MORRISON** |
| *Defendant.* |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON MORRISON, declares as follows.

1.    I am employed by NipponKoa Management Corporation ("NipponKoa"), co-manager of NipponKoa Insurance, Ltd., U.S. Branch. My position is Ocean Marine Executive. My offices are located at 14 Wall Street in New York City.

2.    I am the person at NipponKoa most knowledgeable of the claim at issue in this case. I or my predecessor, Jack Hilferty hired the surveyors to investigate the claims; communicated with the assureds regarding the damage and value of the cargo; reviewed and evaluated the numerous claim documents submitted concerning condition and value of the damaged cargo; and calculated and approved the amount payable to each of the assureds under the insurance policies. Jack Hilferty lives in New Jersey.



3. Thus, Jack and I are the NipponKoa witnesses most knowledgeable about the

damages aspects of these claims.

I declare the foregoing is true and correct under the penalty of perjury of the laws

of the United States.

Dated:  New York, New York
      May 27, 2008

SHARON MORRISON





Providing claims services to the insurance industry since 19·

Member of **VI'S Uni»vers**
adjusters network

## Welcome to VeriClaim

As a global leader in property, casualty and marine insurance adjusting, c
surveying and recovery services, VeriClaim has combined qualified, dedic
claims professionals with systems technology to provide the tools necessai
service our clients. VeriClaim is committed to providing efficient and comp
assessment and adjustment of losses throughout the world.

For over 85 years, first as Toplis and Harding, then as McLarens Toplis N
America, our culture has been to empower our people to deliver respon
innovative and customer-driven solutions that our clients have come to expect.

Listening to the needs of our clients, we have built a new global network. VeriC
is a founding member of vrs universe adjusters network LLC, the lar
independent claims network in the world. Clients of vrs universe benefit from
combined experience of highly qualified professionals applying the same
standards on which our clients have come to rely. Our steadily expanding net
currently comprises over 300 offices in 65 countries around the world.

At VeriClaim, just as before, there is nothing more important to us than servin
clients. We look forward to the opportunity to serve you.

VeriClaim Login | Terms of Use | Privacy
© 2002-2003 VeriClaim, Inc. All Rights Res
info@VeriClaimInc.com Tel: (630) 245
Brand & Web Design by SIRI



EXHIBIT **11**





Providing claims services to the insurance industry since 19·

Member of **VrS uni»vers**
adjusters network

International Locations

## Domestic Locations (click on state in list for offices):

**Alabama**
**Arizona**
**California**
**Colorado**
**Connecticut**
**Florida**
**Georgia**
**Illinois**
**Kansas**
**Kentucky**
**Louisiana**
**Maryland**
**Massachusetts**
**Michigan**
**Minnesota**
**North Carolina**
**Nevada**
**New Jersey**
**New York**
**Ohio**
**Pennsylvania**
**Tennessee**
**Texas**
**Washington**
**Wisconsin**
**Virgin Islands**

VeriClaim Login | Terms of Use | Privacy
© 2002-2003 VeriClaim, Inc. All Rights Res
info@VeriClaimInc.com Tel: (630) 245
Brand & Web Design by SIRI

POWERED BY SITESAGE